COMMONWEALTH *vs.* JOHN BACIGALUPO.

Suffolk. October 9, 2009. - December 14, 2009.

Present: MARSHALL, C.J., SPINA, COWIN, BOTSFORD, & GANTS, JJ.

*Practice, Criminal,* Required finding, Double jeopardy, Hearsay, Admissions and confessions, Confrontation of witnesses. *Evidence,* Hearsay, Admissions and confessions, Statement of codefendant. *Constitutional Law,* Double jeopardy, Admissions and confessions, Confrontation of witnesses.

At the trial of indictments charging two codefendants with, inter alia, the murder in the first degree of a victim killed in Saugus, as well as the armed assault with intent to murder and assault and battery by means of a dangerous weapon of two victims in Revere, the evidence was sufficient to permit the jury to conclude that the defendant was one of the shooters of the Saugus victim, where the defendant was linked to the murder by the ballistics evidence; by the Saugus victim's relationships with the Revere victims, on the one hand, and the relationships of the codefendants on the other; and by the motive for the attacks, as well as the geographical proximity and timing of the events [489-491]; however, this court reversed the defendant's convictions, as well as the denial of his first motion for a new trial, where the erroneous admission in evidence of testimony by a witness recounting a confession by the nontestifying codefendant, which implicated the defendant, in violation of the defendant's right under the Sixth Amendment to the United States Constitution to confront the witnesses against him, was not harmless beyond a reasonable doubt, in that, despite forceful limiting instructions by the judge, the witness's references to the defendant as the witness's "friend" and by the defendant's nickname suggested to the jury that the witness was referring to the defendant [492-496].

INDICTMENTS found and returned in the Superior Court Department on June 29, 2000.

The cases were tried before *James D. McDaniel, Jr.,* J., and a motion for a new trial, filed on July 9, 2001, was heard by him; a second motion for a new trial, filed on April 5, 2004, and amended on June 14, 2005, was heard by *Charles J. Hely,* J.

*Wendy H. Sibbison* for the defendant.

*Macy Lee,* Assistant District Attorney, for the Commonwealth.

COWIN, J. The defendant and a codefendant, Gary Carter, were convicted by a jury in the Superior Court of murder in the

first degree on the theory of deliberate premeditation. Both men were also convicted of two counts of armed assault with intent to murder; two counts of assault and battery by means of a dangerous weapon; one count of unlawful possession of a firearm; and one count of unlawful possession of ammunition. The defendant appeals from the convictions and from the denial of his motions for a new trial.[1] We reverse the defendant's convictions because, in contravention of *Bruton* v. *United States*, 391 U.S. 123 (1968) (*Bruton*), the codefendant's extrajudicial confession implicating the defendant was admitted in evidence. We address also the sufficiency of the evidence, recognizing that, if the evidence at the first trial was insufficient for conviction, a new trial would be impermissible as violative of the defendant's right against double jeopardy. See *Commonwealth* v. *Cardenuto*, 406 Mass. 450, 457 (1990), citing *Burks* v. *United States*, 437 U.S. 1, 18 (1978).

1. *Facts and procedural background.* Because there is a challenge to the sufficiency of the evidence, we summarize the evidence in the light most favorable to the Commonwealth. See *Commonwealth* v. *Cannon*, 449 Mass. 462, 467 (2007). Two shootings occurred in the early morning of November 24, 1996: the first at Club Caravan in Revere at shortly after 1 A.M., and the second outside the Comfort Inn in Saugus at about 1:30 A.M.[2] The two locations were only "[m]inutes" apart by car at that time of night. Each of the victims of the first shooting, confederate drug dealers Charles McConnell and Vincent Portalla, survived. Robert Nogueira, Portalla's "enforcer," died in the second shooting.

Just after midnight on November 24, 1996, McConnell and Portalla were looking for the defendant and Carter to collect money that they owed to Portalla.[3] They drove to the defendant's home in Winthrop but could not locate him. They then drove to Carter's house, where they found Carter sitting outside in a blue Ford Taurus automobile. Carter was wearing gloves

---

[1] A motion to sever the appeals of the two defendants was allowed in this court.

[2] While there were discrepancies in the testimony, all the testimony is consistent that the events were extremely close in time, certainly no more than thirty minutes apart.

[3] Portalla and his colleagues had been paging Carter and the defendant, calling them on their cellular telephones, and driving by their houses in an effort to persuade them to pay their debts.

and appeared nervous and "jittery." McConnell became concerned because wearing gloves "usually" indicated that a person is "up to something." Carter told Portalla that he had heard that Portalla was looking for him and asked if Portalla was "out to hurt [him]." Carter then told the two men to follow him, and they did so, as he drove to Club Caravan in Revere.

Outside the club, Carter and Portalla left their respective automobiles and, for approximately ten minutes, engaged in a heated discussion, which McConnell observed. Carter repeated that he had heard that Portalla had "been looking for us [and] want[ed] to hurt us." Portalla denied this and pulled up his shirt to indicate that he was unarmed. The men then spoke in normal tones. Shortly thereafter, the defendant "came ripping around the corner" in a black Lincoln Town Car automobile. He put on a glove and jumped out, holding a pistol. Portalla and the defendant wrestled over the gun. When the defendant's pistol discharged into the air, Portalla, who was unarmed, ran into the club. The defendant fired approximately five times at him, hitting him in the buttocks. As McConnell fled in Portalla's car, the defendant and Carter simultaneously fired at McConnell, shooting him in the back and arm. Neither McConnell nor Portalla originally identified the shooters to police. In a recorded conversation with a friend the day after the shootings, McConnell identified the defendant and Carter as his assailants.[4]

An employee at Club Caravan ran outside immediately after the shooting. He observed a dark blue or black car going around the rotary. It was a large car, "like a Cadillac or a Continental"; he considered a Lincoln Town Car to be a Continental. When the police responded to Club Caravan, they discovered a blue Ford Taurus rental car in the parking lot. The car had been rented to Carter, and in it was a clip "fully loaded" with nine millimeter ammunition. This ammunition was of the same type as casings found at the scene of the later shooting in Saugus.

As stated, the third victim was Nogueira, Portalla's "enforcer."

---

[4] The conversation was recorded because, unbeknownst to McConnell, his friend was a Federal government informant. Over the objection of both defendants, the tape recording of the conversation was played at trial. The judge allowed the recording to be played on the ground that it was a prior consistent statement by McConnell. Because the admissibility of the recording is not challenged on appeal, we express no view on the propriety of the judge's ruling.

He "handled" Portalla's "problems," i.e., he collected the money people owed Portalla for drug purchases. Nogueira had a reputation in the community for violence and was "a dangerous guy." On the night of the shooting, Nogueira was at a Comfort Inn on the Revere-Saugus border, where he had been staying for a "good couple of weeks." At about 1 A.M., the night clerk at the Comfort Inn saw Nogueira leave the motel; the clerk heard shots immediately thereafter.[5] Nogueira was shot twenty times.

The ballistics evidence recovered from the body of Nogueira and from the two crime scenes established that two different weapons, one revolver and one semiautomatic firearm, were used in the shootings and that one of the weapons, the semiautomatic, had been used at both locations. State police ballistics evidence indicated that a copper-jacketed bullet found in McConnell's getaway car and a full metal-jacketed bullet recovered from Nogueira's body were fired from the same weapon. Although the ballistics evidence established that a second weapon was used at each scene, no determination could be made whether the second weapon was the same one used at both scenes.[6]

Prior to trial, the defendant moved to sever his trial from Carter's because Carter had earlier recounted to John Patti the roles that he and the defendant played in the shootings. Carter's confession to Patti implicated the defendant, and the Commonwealth planned to call Patti as a witness. The judge denied the motion but stated that, when Carter's confession was introduced, he would exclude any testimony that referred to the defendant.

Immediately after trial, the defendant filed a motion for a new trial based primarily on the denial of his motion to sever. The motion for a new trial was denied by the trial judge. The defendant filed a notice of appeal both from his convictions and from the denial of his motion for a new trial. The defendant later filed a second motion for a new trial. As a result, this court stayed the defendant's appeal pending a decision on the second motion for a new trial. The second motion for a new trial was heard by a

---

[5] The clerk's testimony that the shooting occurred at about 1 A.M. is inconsistent with all other testimony. The clerk testified that she telephoned the police immediately after the shooting, but the police radio broadcast of the Saugus shooting was not until 1:25 A.M.

[6] The second weapon at both locations used the same type of ammunition, but the type of ammunition in question is quite common.

judge other than the trial judge.[7] After an evidentiary hearing, the second motion for a new trial was denied. Together with his earlier appeal, the defendant appealed the denial of his second motion for a new trial.

2. *Sufficiency of the evidence.* If the evidence at trial was legally insufficient to sustain a verdict, a new trial would violate the prohibition against double jeopardy and would therefore be impermissible. *Corson* v. *Commonwealth*, 428 Mass. 193, 196-197, 201 (1998). *Berry* v. *Commonwealth*, 393 Mass. 793, 794, 796-798 (1985). Accordingly, we must first consider the defendant's claim that there was insufficient evidence that he committed the murder of Nogueira in Saugus. The defendant does not challenge the sufficiency of the evidence supporting his convictions with respect to the shootings in Revere.

The defendant moved for a required finding of not guilty at the close of the Commonwealth's evidence. In reviewing the denial of a motion for a required finding, we consider "whether the evidence, in its light most favorable to the Commonwealth, . . . is sufficient . . . to permit the jury to infer the existence of the essential elements of the crime charged." *Commonwealth* v. *Latimore*, 378 Mass. 671, 676-677 (1979), quoting *Commonwealth* v. *Sandler*, 368 Mass. 729, 740 (1975). "[T]he evidence and the inferences permitted to be drawn therefrom must be 'of sufficient force to bring minds of ordinary intelligence and sagacity to the persuasion of [guilt] beyond a reasonable doubt.' " *Commonwealth* v. *Latimore*, *supra* at 677, quoting *Commonwealth* v. *Cooper*, 264 Mass. 368, 373 (1928). In this analysis we do not weigh the supporting evidence against conflicting evidence, nor do we consider the credibility of the witnesses. *Commonwealth* v. *Lao*, 443 Mass. 770, 779 (2005). *Commonwealth* v. *Lydon*, 413 Mass. 309, 311 (1992). The Commonwealth may rely on circumstantial evidence. *Commonwealth* v. *Degro*, 432 Mass. 319, 325 (2000). In viewing the evidence, the inferences we draw need only be "reasonable and possible," not necessary. *Commonwealth* v. *Longo*, 402 Mass. 482, 487 (1988), quoting *Commonwealth* v. *Casale*, 381 Mass. 167, 173 (1980). Because the defendant moved for required findings at the close of the Commonwealth's case and again at the close of all the evidence, "[w]e consider the

---

[7]The trial judge had retired by the time the second motion for a new trial was filed.

state of the evidence at the close of the Commonwealth's case to determine whether the defendant's motion should have been granted at that time. We also consider the state of the evidence at the close of all the evidence, to determine whether the Commonwealth's position as to proof deteriorated after it closed its case." *Commonwealth* v. *Sheline*, 391 Mass. 279, 283 (1984).

We review the evidence and the reasonable inferences therefrom to determine whether there was sufficient evidence to warrant a jury in concluding that the defendant was one of the shooters of Nogueira. Ordinarily, in determining the sufficiency of the evidence, we include evidence improperly admitted. See *Commonwealth* v. *DiBenedetto*, 414 Mass. 37, 45-46 (1992). See also *Lockhart* v. *Nelson*, 488 U.S. 33, 34 (1988). We do not do so here because the judge instructed the jurors that Carter's statements describing the shootings were not to be used against the defendant, thus (theoretically, at least) treating that portion of the statements as if they had not been admitted.

There was no direct evidence that the defendant was involved in the shooting of Nogueira in Saugus. He is linked to that killing, however, by the ballistics evidence, the relationships of the victims on the one hand and the defendants on the other, and the motive for the attacks, as well as by the geographical proximity and timing of the shootings. From the testimony of McConnell,[8] it is clear that the defendant and Carter were the two shooters at Club Caravan. Indeed, the defendant does not suggest otherwise. The ballistics evidence established that two weapons were used at both crime scenes. One of the weapons was the same at both locations; it could not be determined if the other weapon was the same at both scenes.

In November, 1996, McConnell and Portalla were "looking for" people who owed money to Portalla. Two of the people they were looking for were Carter and the defendant. A reasonable inference is that the motive for the shootings was an at-

---

[8]McConnell was the key Commonwealth witness at trial and testified pursuant to a proffer agreement with the district attorney's office. McConnell began cooperating regarding the shootings in this case immediately after his arrest by Federal authorities for other, unrelated large-scale drug offenses. Following that arrest, he testified for the United States (in a case against Portalla) and served approximately four years for conspiracy to distribute cocaine. Portalla was not called as a witness by either side. At the time of trial, he was serving time in a Federal penitentiary.

tempt by Carter and the defendant to avoid paying these debts. Carter feared that Portalla was about to harm him because of the money he owed Portalla. The inference from the evidence is that, when McConnell and Portalla located Carter outside his home, Carter lured Portalla and McConnell to Club Caravan so that he (Carter) and the defendant could ambush them. The inference is warranted because, soon after the men arrived at the club, the defendant, driving rapidly, arrived in a black Lincoln Town Car; put on a glove; jumped out of his car; and began shooting at Portalla. Given the sequence and timing of these events, the jury could permissibly conclude that the defendant's arrival and ensuing armed assault were not accidental.

Although there is no direct evidence that Carter and the defendant left Club Caravan together, the jury could infer that they did. The inference that they remained together is significant because two weapons were used to kill Nogueira in Saugus, and one of the weapons was the same as one of the weapons used in the Revere shootings. A large, dark car was seen driving around the rotary outside Club Caravan immediately after the shootings. The defendant had arrived at the club in a black Lincoln Town Car. Carter left his rented blue Ford Taurus at the club and departed so quickly that he left in the car a fully loaded ammunition clip. It is conceivable that Carter could have walked from the scene, but it is only logical to believe that he left in the car with the defendant (he would want to leave as quickly as possible). Because Nogueira was Portalla's "enforcer," the fact that both Carter and the defendant shot Portalla would suggest that both may then have joined in trying to shoot his "enforcer." The scenes of the two shootings were in close proximity ("[m]inutes" by car at that hour), and the two shootings, which the evidence suggests were related, occurred within twenty-five minutes of each other. These factors support the inference that the defendant was one of the two men who killed Nogueira. Drawing the reasonable inferences in favor of the Commonwealth, the evidence was sufficient to establish the defendant's guilt beyond a reasonable doubt.[9,10]

---

[9]The Commonwealth's case did not deteriorate between the time the Commonwealth rested and the closing of all the evidence.

[10]As stated, *supra*, in our review of the evidence, we have not included the evidence improperly admitted in contravention of *Bruton* v. *United States*, 391 U.S. 123 (1968).

3. *The* Bruton *issue.* The defendant claims that the testimony given by the witness, John Patti, recounting Carter's confession to him shortly after the shootings incriminates the defendant and violates the principle of *Bruton, supra.* Patti's testimony on direct examination referred to the defendant solely as Carter's unnamed "friend" (in compliance with the judge's order) and included statements that the "friend" drove up to Club Caravan and got out of his car immediately before the shooting of Portalla and McConnell. In addition, on cross-examination, Patti agreed that Carter said that "Johnny" shot Nogueira at the Comfort Inn. Earlier in his testimony, Patti had referred to the defendant as "Johnny." The judge instructed emphatically that none of Carter's statements could be used against the defendant.

In *Bruton,* the United States Supreme Court reversed the defendant's conviction because the introduction of a nontestifying codefendant's confession implicating the defendant violated the defendant's right to confront the witnesses against him in contravention of the confrontation clause of the Sixth Amendment to the United States Constitution. The confession added "substantial, perhaps even critical, weight to the Government's case in a form not subject to cross-examination since [the codefendant] did not take the stand. [The defendant] was thus denied his constitutional right of confrontation." *Bruton, supra* at 128. The Court also doubted that a curative instruction would alleviate the prejudice and concluded that the risk that the jury may not follow such an instruction is too great. "[W]e cannot accept limiting instructions as an adequate substitute for [the defendant's] constitutional right of cross-examination. The effect is the same as if there had been no instruction at all." *Id.* at 137.

The *Bruton* rule was limited by *Richardson* v. *Marsh,* 481 U.S. 200 (1987) (*Richardson*). In *Richardson,* the Court held that "the Confrontation Clause is not violated by the admission of a nontestifying codefendant's confession with a proper limiting instruction when . . . the confession is redacted to eliminate not only the defendant's name, but any reference to his or her existence." *Id.* at 211.[11] The Court specifically declined to consider at that time the admissibility of a confession in which

---

[11]In *Richardson* v. *Marsh,* 481 U.S. 200, 203-204 (1987), a joint murder

the defendant's name "has been replaced with a symbol or neutral pronoun." *Id.* at 211 n.5.

The question whether the use of a symbol or neutral pronoun would violate the *Bruton* rule was resolved in *Gray* v. *Maryland*, 523 U.S. 185 (1998) (*Gray*). In *Gray*, a nontestifying codefendant's confession was redacted by substituting the word "deleted" or "deletion" each time Gray's name appeared. The Supreme Court held that such a redacted confession was within the class of statements protected by *Bruton* and that the nonconfessing defendant's name could not be replaced with an obvious blank space, a word such as "deleted," a symbol, or other similarly conspicuous type of alteration. Because the redacted confession still "refer[red] directly to the 'existence' of the nonconfessing defendant" and incriminated him, the Court held that it fell within the *Bruton* rule. *Gray*, *supra* at 192, citing *Richardson*, *supra* at 207.

Patti's reference to Carter's "friend" suggested to the jury that Carter was referring to the defendant. This implication was strengthened by the fact that only two people were on trial for the shootings that Carter said were committed by himself and a "friend." Thus, the jury logically would have inferred that the "friend" was the defendant. In addition, repeated objections by the defendant's counsel, the judge's forceful instructions that Patti's testimony did not concern the defendant, and the judge's repeated admonitions to Patti on how to respond properly to the questions (to testify only to "what . . . Carter did, not what anybody else did") only emphasized to the jury that the "friend" was indeed the defendant.[12] This is particularly so given that McConnell's earlier testimony named Carter and the defendant

---

trial of two defendants, the confession of one defendant, Williams, was redacted to omit all reference to the other codefendant, Marsh. There was no indication in the confession that anyone other than Williams and a third person took part in the crime. The jury were also instructed not to consider the confession against Marsh. As redacted, the confession indicated that only Williams and the third person had discussed the murder in the front seat of a car while driving to the victim's house. There was no suggestion in the confession that Marsh or any other person was in the back seat of the car at the time.

[12]The pertinent portions of Patti's testimony are the following (emphases added):

*Q.*: "What did he tell you happened?"

*A.*: "He said a *friend* of his came flying up in the hot box."

as the two shooters at Club Caravan. Moreover, when Carter's attorney cross-examined Patti, Patti agreed that "Johnny" shot at Nogueira at the Comfort Inn, and Patti had earlier referred in his testimony to the defendant as "Johnny."[13] Pursuant to *Gray, supra* at 195, nicknames fall under the rule of *Bruton* as much

. . .

*Q.*: "What did Mr. Carter tell you he did at that point in time, if anything?"

*A.*: "*His friend* was exiting the car that he pulled up in, the hot box. And then he tried to wave *his friend* off. He put his arms up and yelled, no, stop."

. . .

*Q.*: "What did Mr. Carter tell you he did?"

*A.*: "*His friend* started —"

THE JUDGE: "No. What did Carter tell you he did."

ATTORNEY FOR DEFENDANT: "I make the same motion again."

THE JUDGE: "Overruled. Now, would you — hold it for just a minute. Let me get this straight. Do you understand his question?"

*A.*: "Yes."

THE JUDGE: "He's asking you what did Carter say that he did, he, Carter did, not what anybody else did, what Carter did. Do you understand that question?"

*A.*: "Yes, I —"

THE JUDGE: "Are you able to answer the question?"

*A.*: "Yeah."

THE JUDGE: "Directly?"

*A.*: "Yes."

THE JUDGE: "All right. Well, answer it, then."

*A.*: "He said he pulled his gun and started firing at Charlie."

*Q.*: "And do you know who Charlie is?"

*A.*: "Charlie McConnell."

[13]On cross-examination, Patti's relevant testimony was as follows:

*Q.*: "Okay. Sir, you told the grand jury that Johnny put his arm out the window, fired a bunch of shots at Bobby and then put two more in his head; right?"

as full names. This reference plainly incriminated the defendant. It was just as "blatant and incriminating . . . as the word 'deleted' in the *Gray* case." *United States* v. *Richards*, 241 F.3d 335, 341 (3d Cir. 2001). The fact that the remark was made during cross-examination by the attorney for the codefendant does not reduce its prejudicial effect on the defendant. See *Commonwealth* v. *Vallejo, ante* 72, 80 (2009) ("We accept the principle that a defendant may be prejudiced in the exercise of his privilege against self-incrimination by the actions and comment of his codefendant's counsel"). See also *Commonwealth* v. *Russo*, 49 Mass. App. Ct. 579, 581-584 (2000).

Other courts have similarly determined that there was a *Bruton* error in the admission of a nontestifying codefendant's accusation of a "friend." See, e.g., *United States* v. *Richards, supra* at 340-341; *United States* v. *Petit*, 841 F.2d 1546, 1556 n.15 (11th Cir. 1988); *People* v. *Fletcher*, 13 Cal. 4th 451, 458, 468-471 (1986); *People* v. *Hernandez*, 121 Ill. 2d 293, 309-318 (1988). Most of these decisions preceded the United States Supreme Court's decision in *Gray, supra*, suggesting the logic of the Supreme Court's holding in *Gray*: even if the defendant is not named, out-of-court statements that clearly refer to the defendant should not be admitted. *Id.* at 192.

Having concluded that a *Bruton* error occurred, we consider the effect of this improperly admitted evidence. A *Bruton* error is one of constitutional dimension. See *Commonwealth* v. *Cook*, 380 Mass. 314, 322 (1980). Preserved constitutional errors are reviewed to determine whether they are harmless beyond a reasonable doubt. *Commonwealth* v. *Vinnie*, 428 Mass. 161, 163 (1998). "The essential question is whether the error had, or might have had, an effect on the jury and whether the error contributed to or might have contributed to the verdicts." *Commonwealth* v. *Perrot*, 407 Mass. 539, 549 (1990). Here, the error was preserved,

---

*A.*: "Yes."

*Q.*: "That's what you told the grand jury?"

*A.*: "That's what he told me."

*Q.*: "And that's what Gary Carter told you?"

*A.*: "Exactly."

and the defendant is entitled to the standard for preserved constitutional error.

McConnell, the witness whose testimony was crucial to the defendant's convictions in regard to the Revere shootings, was a convicted felon testifying pursuant to a proffer agreement with the Commonwealth. He did not name his assailants to the government until, four years after the shootings, he was in jeopardy of being charged with serious offenses.[14] Thus, the introduction of an inadmissible confession by a codefendant, naming a "friend" as participating in the shootings, buttressed the testimony of McConnell (testimony that the jury may otherwise have rejected).[15] Identification of one of the shooters of Nogueira as "Johnny" significantly added to the Commonwealth's case against the defendant for Nogueira's murder. Accordingly, we conclude that the error "had, or might have had," an effect on the jury; the evidence of Carter's statement implicated the defendant in each of the shootings and requires reversal of all his convictions. See *id.*

4. *Conclusion.* Because of the violation of the *Bruton* rule and its potential effect on the outcome here, we reverse the defendant's convictions and the denial of his first motion for a new trial.[16]

*So ordered.*

---

[14]McConnell did, however, name Carter and the defendant as the shooters in a conversation with a friend the day after the shootings. See note 4, *supra.*

[15]While McConnell's credibility is not relevant to our consideration of the sufficiency of the evidence, *supra*, it is relevant to whether the defendant was prejudiced by the improper admission of Carter's confession.

[16]The judge who heard and decided the second motion for a new trial did not rule on the *Bruton* issue. He concluded, correctly, that it had been considered and ruled on by the trial judge and had been preserved for the defendant's direct appeal. Additional claims of error are raised in the second motion for a new trial. Because these matters are not likely to arise at retrial, we do not consider them.