NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

12-P-719                                         Appeals Court


COMMONWEALTH  vs.  MARKEESE MITCHELL (and two companion cases[1]).


No. 12-P-719.

Suffolk.     September 10, 2015. - January 28, 2016.

Present:  Green, Rubin, & Hanlon, JJ.


Homicide.  Practice, Criminal, Motion to suppress, Admissions
    and confessions, Voluntariness of statement, Sentence,
    Severance, Confrontation of witnesses, Argument by
    prosecutor, Instructions to jury.  Evidence, Voluntariness
    of statement, Statement of codefendant, Verbal
    completeness, Relevancy and materiality, Knife, Bias.
    Constitutional Law, Admissions and confessions,
    Voluntariness of statement, Sentence, Confrontation of
    witnesses.


    Indictments found and returned in the Superior Court
Department on April 18, 2008.

    Pretrial motions to suppress evidence and to sever were
heard by Charles J. Hely, J.; the cases were tried before Judith
Fabricant, J., and a motion for a postconviction evidentiary
hearing, filed on December 3, 2012, was heard by her.


    Richard L. Goldman for Terrance Pabon.
    Richard B. Klibaner for Pedro Ortiz.
    Jeanne M. Kempthorne for Markeese Mitchell.
    Amanda Teo, Assistant District Attorney (Mark A. Hallal,

---

[1] One against Terrance Pabon and one against Pedro Ortiz.

Assistant District Attorney, with her) for the Commonwealth.

HANLON, J.  After a jury trial, the defendants, Markeese Mitchell, Terrance Pabon, and Pedro Ortiz were convicted of murder in the second degree in connection with the stabbing death of Terrance Jacobs.  Paul Goode also was indicted, tried with the defendants, and convicted of murder in the second degree.  Goode's direct appeal originally was consolidated with the others; however, by motion and pursuant to an order of this court, Goode's appeal was severed.  Goode's statement to the police was admitted at trial and is the predicate for one of the defendants' common claims of error, under Bruton v. United States, 391 U.S. 123, 135-137 (1968).  Pabon and Mitchell claim error in the denial of their respective motions to suppress their statements to the police.  They also contend that, because they were between the ages of fourteen and seventeen when the crime occurred, they ought to have been afforded individualized sentencing, in light of Miller v. Alabama, 132 S. Ct. 2455 (2012), and Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. 655 (2013).  In addition, some or all of the defendants claim error in the admission of Pabon's statement to the police; certain evidentiary rulings at trial; certain remarks made by the prosecutor in closing argument; the denial of their request for a jury instruction on withdrawal from a

joint venture; and the denial of their postconviction motion for permission to inquire of a juror who, they alleged, had reasons to be biased against them.

We have examined each of their contentions and conclude there was no error.  We therefore affirm the judgments and the order of the judge denying the postconviction motion.

Background.  The jury could have found the following facts.[2] On May 22, 2007, sixteen year old Terrance Jacobs was beaten and stabbed to death in the Mattapan section of Boston.  Four months earlier, Jacobs had been charged with slashing the face of one Jaleek Leary outside a local skating rink called "Chez Vous." Leary was fourteen years old and the defendants were among his friends and relatives.

On the afternoon of May 22, 2007, Pabon, Mitchell, and Ortiz were in the area of 10 Wilcock Street in Mattapan, drinking and smoking.  A number of other individuals were present, including the codefendant Goode and one Dedrick Cole, who testified at the trial.  At 7:00 P.M., Richard Allen and Orlando Waters arrived and approached the group.  Waters indicated that he was part of a local gang ("M.O.B.").  Ortiz responded that someone from M.O.B. had slashed the face of his cousin, Jaleek Leary.  Ortiz sought "a fair one" -- i.e., a one-

---

[2] We reserve a more detailed description of the facts for discussion of the relevant issues.

on-one fistfight without weapons -- in response to that attack. Waters said that he was amenable; he returned to his vehicle and drove away. Allen remained on the scene. Ortiz then informed Cole that either Pabon or Emmanuel DeJesus ("Pudge") would fight the "kid" (i.e., Jacobs) who had cut Leary.

Approximately thirty minutes later, at about 7:30 P.M., and while it was still daylight, Waters returned to Wilcock Street, accompanied by two males. Cole recognized one of the two males as a "guy I knew as Justice." After exchanging brief words with Allen, Waters left the scene, only to return with a larger group; among them was the victim, a boy whom Cole had known as "Terra."

When the two groups faced off, Ortiz asked Waters if the fight was "on." Ortiz pointed to Pudge as the fighter for the Wilcock Street group. Pudge was just under six feet tall and muscular, weighing about 210 pounds. The victim voiced some qualms about fighting Pudge. The victim was slightly built, no more than 150 pounds, and at least four inches shorter than his opponent. While the victim continued to express his misgivings about having to fight, Waters forcibly pushed him toward Pudge, sparking a brawl among all present. Ortiz, Pabon, and Mitchell struck the victim in the face with their fists. Waters and two associates initially joined the scrum but then backed off, but

not before one man took out a handgun and fired three or four shots toward the crowd, prompting those assembled to flee.

The victim managed to gather himself and then ran on foot into oncoming traffic on Blue Hill Avenue.  Pabon chased after him and stabbed him in the back more than once, using a knife. Mitchell, Ortiz, and Goode followed in pursuit.  They all turned onto Havelock Street,[3] where the chase was recorded by two surveillance cameras mounted on an establishment known as Kay's Oasis, at the corner of Havelock Street and Blue Hill Avenue. All of the defendants were identified in the surveillance footage, which showed them running (or, in Mitchell's case, riding a bicycle) to and from the area where the victim was found lying face down, bleeding profusely.[4]  There was testimony that Mitchell stabbed the victim and then walked away "wiping the blood on a pole."  Another witness testified that Mitchell, Ortiz, and Pabon all stabbed the victim.  Still another witness testified that "[t]he person that was on the bike was ramming their bike into the person on the ground," while another person was "making a jabbing motion with [his] right hand . . . [a]nd

---

[3] Wilcock Street and Havelock Street are one-way parallel streets, lying side by side off Blue Hill Avenue, which is a main thoroughfare in Mattapan and Dorchester.

[4] The surveillance cameras did not capture what happened at the location where the victim was found lying on the ground. However, he had sustained at least nineteen stab wounds.

also kicking" the victim, in the "abdomen area . . . , chest, back, stomach area."

At about 8:00 P.M., a Boston police detective came to the scene in an unmarked vehicle; he had been alerted about the street brawl by a concerned citizen.  Within a minute or two, Boston emergency medical technicians arrived, attended to the victim, and transported him to a local hospital, where he was pronounced dead.  The murder weapons were not recovered.

On June 19, 2007, two Boston police detectives, in plain clothes, interviewed Pabon at his Avondale Street home, in the presence of his mother.  Pabon's interview was recorded and admitted at trial, over the codefendants' objections.  Eight days later, on June 27, the same detectives interviewed Mitchell, with his father and grandfather present, at the home of his grandfather in Brockton.  Mitchell made a statement to police but declined to have a recording made.

Pabon and Mitchell filed separate motions to suppress their statements to the police.  A motion judge, who was not the trial judge, denied both motions with careful findings of fact and rulings.  The motion judge also heard the defendants' motions to sever each of their respective cases for trial; the requests were based upon what the defendants perceived to be a Bruton issue stemming from the Commonwealth's expected use, at the joint trial, of a statement that Goode had made to the police.

The judge denied the severance requests and ordered that Goode's police statement be redacted to exclude any reference to any codefendant by name.  The Commonwealth did so.

Analysis.  1.  Motions to suppress.  Reviewing the denial of a motion to suppress, we must accept the motion judge's findings of fact, which shall not be disturbed absent clear error.  Commonwealth v. Tremblay, 460 Mass. 199, 205 (2011).  We review de novo the judge's application of the law to the facts found.  Commonwealth v. Mercado, 422 Mass. 367, 369 (1996).  Questions as to the credibility of a witness are matters for the judge to decide.  Commonwealth v. Tremblay, supra.

a.  Mitchell's statement.  The motion judge found the following facts.  On June 27, 2007, Mitchell's grandfather, Timothy Johnson, returned a telephone call from a Boston police detective and agreed that the police would interview Mitchell at Johnson's home in Brockton.  That same day, at about 9:05 P.M., Detectives Paul McLaughlin and Michael Devane arrived at Johnson's home in plain clothes and met with Johnson, Mitchell, and Mitchell's father, Humberto Hernandez.  Mitchell was sixteen years old.  The detectives told the three that, if they felt uncomfortable at all, they could end the conversation at any time and the detectives would leave.  Johnson asked the detectives to sit at a kitchen table for the interview.  When Mitchell joined them, the detectives told him that they were

from the Boston Police Homicide Unit and assigned to the investigation of the victim's murder.  Mitchell, Johnson, and Hernandez agreed to go forward with the interview.

Mitchell denied any knowledge of the incident and stated that he did not recall seeing anyone get stabbed.  McLaughlin then asked to speak with Johnson and Hernandez separately, in an adjacent room, and he showed the two men photographs of Mitchell on a bicycle and on foot at the crime scene.  McLaughlin indicated that Mitchell was not telling the truth about the incident.  In the interim, nothing of substance was said between Devane and Mitchell at the kitchen table.  The detectives then asked if they could make a sound recording of the remainder of the interview.  Johnson, Hernandez, and Mitchell all declined.

The detectives informed Mitchell that they knew he was at least a witness to the stabbing, and they showed him a surveillance photograph depicting a young man in a red shirt on a bicycle; Mitchell admitted that he was the boy on the bicycle. Presented with a second photograph, Mitchell admitted that he was the boy in the image depicted running next to another male on a bicycle.  Those photographs were taken just minutes before the victim was stabbed while he was lying close by on the sidewalk.  Mitchell also confirmed that he was the boy in a red shirt seen running in two other photos.  Mitchell said he could not identify anyone else in those photographs.

When the detectives showed Mitchell other surveillance photographs, he identified a "black/Hispanic" male in a green tank top as "Terrance," and said he did not know Terrance's last name.  In another photo, Mitchell identified a similar male in a striped shirt as Terrance.  The detectives determined that this male was Terrance Pabon.

In response to McLaughlin's observation that the surveillance video showed Mitchell running directly to the spot where the stabbing took place, Mitchell stated, "I just remember kids running."  He added, "I kept running" and "I didn't see anything."  Mitchell stated that he ran through a nearby yard to reach Wilcock Street.  He denied taking a knife from one of the attackers and wiping the blade on an object.  The detectives told Mitchell and his father and grandfather that Mitchell was not being honest about the incident and that they might need to talk with him again.  The interview ended and the detectives left the home at 10:25 P.M.; Mitchell was not arrested until March, 2008.

In a supplemental brief, Mitchell argues that the motion judge's finding that his statement was voluntary was erroneous, given the "totality of the circumstances, including his age, mental, psychological, and educational deficits, and other factors."  He also argues that the motion judge did not take into account his age in determining that he was not in custody

during the meeting with police and that, as a result, Miranda warnings should have been given to him and his father and grandfather.

We disagree, essentially for the reasons well explained and supported by the motion judge.[5] We are satisfied that Mitchell's statement to the police was not a product of a custodial police interrogation and that, as a result, no Miranda warning was required. Miranda v. Arizona, 384 U.S. 436, 444 (1966). See Commonwealth v. Bermudez, 83 Mass. App. Ct. 46, 51-53 (2012). See also Commonwealth v. Libby, 472 Mass. 37, 47 (2015) ("Given

---

[5] The judge noted, inter alia, that the detectives did not appear at the grandfather's home by surprise; they had made an appointment, giving the defendant time to consult with two interested adults before the interview began. The judge indicated his awareness of the defendant's limitations, including a diagnosis of attention deficit hyperactivity disorder, participation in special education classes, and a history of substance abuse. However, despite the testimony of Dr. Fabian Saleh, a forensic psychiatrist called by the defendant, "that he seriously doubted whether the defendant had a clear understanding that he could voluntarily refuse to be interviewed," the judge specifically found "that the defendant's version of the police interview in Dr. Saleh's report [was] not reliable or credible." In particular, the interview with Dr. Saleh took place "more than a year after the defendant was arrested and indicted and more than two years after the police interview . . . at [a time when] the defendant had a powerful incentive to make his police interview sound involuntary." The judge noted that, "[w]hen the detectives asked to record the interview, the defendant asserted himself and refused. The detectives honored his refusal." Finally, throughout the interview, the "defendant continued to insist that he was not involved and that he did not see the attack. The defendant made his statements not because of any lack of understanding or lack of voluntariness but because he wanted to deny being involved in the attack. . . . The defendant's will was not overborne."

our conclusion that the defendant was not in custody . . . , his interview . . . was simply not governed by Miranda").  In addition, the motion judge correctly ruled that Mitchell's statement was made voluntarily, without coercion by the police.  See Commonwealth v. Tremblay, 460 Mass. at 207.  See also Commonwealth v. Sheriff, 425 Mass. 186, 192 (1997).

b.  Pabon's statement.  In brief, the motion judge found the following facts as to Pabon's statement to police following his arrest on March 1, 2008.  That morning at 7:20 A.M., Boston police officers arrested Pabon and transported him to police headquarters.  McLaughlin and Devane met with Pabon in an interview room.  At the outset, the detectives gave Pabon a coffee and offered him an opportunity to make a telephone call.  Pabon deferred, indicating that he would wait to hear what the detectives had to say.  The detectives explained the process of electronically recording an interview; Pabon agreed to talk with the police, but he declined to have his statement recorded and signed a form confirming that choice.  McLaughlin then read Pabon the complete Miranda warnings, showing him the police department's warning and waiver form.  After reading each warning, McLaughlin asked Pabon if he understood.  Pabon said he did, and initialed each warning.  Pabon was then eighteen years old.  He was alert and responsive to the detectives' questions.

Pabon reiterated that he had been truthful when he gave the police an earlier statement at his home on June 19, 2007, with his mother present, and he maintained that the stabbing of his cousin, Jaleek Leary, had nothing to do with the events in question. The detectives explained that there were different degrees of the crime of murder and that they were interested in where this particular case "fell in that spectrum" of possible criminal offenses. They urged Pabon to be honest.

Pabon stated there were "a lot of people out on the street" on May 22; he mentioned some of the individuals who were present and denied witnessing the stabbing. Pabon further denied that there had been a plan to fight the victim. Presented with the surveillance video, Pabon stated it had been "stupid" for Jacobs to go down to Wilcock Street. At 8:25 A.M., Pabon was allowed to use the restroom. He drank Vitamin Water, obtained from a vending machine. The detectives gave Pabon a snack. Pabon made two telephone calls using his cellular telephone. His initial call lost its connection; Pabon then spoke for several minutes during his second telephone call.

When the interview resumed, the detectives showed Pabon still images from the surveillance video. When the police informed Pabon that they knew that the male in the video seen wearing a green tank top and, later, a white polo shirt was him, Pabon confirmed it was true. The detectives indicated to Pabon

that the photographs showed him as the first person to come upon the victim on the sidewalk on Havelock Street.  Pabon asked, "[W]here's K-EZ?"[6]  The detectives said they knew where K-EZ was but did not elaborate.  Pabon then asked for an explanation of the different degrees of murder.  The detectives complied.  Pabon stated, "So I can't get manslaughter."  Devane described the theory behind joint venture by analogizing the concept to a sports example (i.e., players of a football team all acting toward a common aim or purpose).

At 8:57 A.M., Pabon stated that he would tell what really happened on May 22.  He indicated that he needed a cigarette, and the police obtained one for him.  Pabon asked the detectives, "[H]ow did you track me?"  This was followed up by some questions as to who did what during the incident.  Pabon denied that he had ever put his hands on the victim.  He denied stabbing anyone.  He did admit to having lied in the earlier interview at his home and in the initial part of this stationhouse interview.  One detective reminded Pabon that anything he said could be used against him, including falsehoods.  Pabon reiterated his desire to tell the truth but refused to have the remainder of the interview recorded.  He indicated that he was too nervous to make a written statement.  Pabon recounted that he and the victim got into a fistfight on

---

[6] Mitchell's nickname was "K-EZ."

Havelock Street.  On an aerial photograph of the crime scene,
Pabon pointed to the spot where the fistfight had occurred,
identifying the sidewalk of Havelock Street, opposite Kay's
Oasis.  This was the area where the victim was found lying
facedown with multiple stab wounds.  Pabon said that he ran
behind the victim, but had not been chasing him.  The victim hit
him in the face with a "good" punch, Pabon recalled, prompting
Pabon to "just quit."  Pabon insisted he did not have a weapon
at the time.  He denied stabbing the victim.  The interview
ended at 10:00 A.M. (a span of some two hours and ten minutes).

Pabon argues that "the police inaccurately described the
law of murder and joint venture during the interrogation," and
that "their statements of the law coerced Pabon to speak, and to
believe that he could not 'get manslaughter.'"  Not only does
Pabon fail to show how the detectives' admittedly colloquial
football team analogy was inaccurate or misleading but, also,
the cases he cites -- Lynumn v. Illinois, 372 U.S. 528 (1963),[7]
and Commonwealth v. Novo, 442 Mass. 262 (2004)[8] -- are readily

---

[7] In Lynumn, a police officer told the defendant that, if
she did not cooperate, she "could get 10 years and the children
could be taken away, and after [she] got out they would be taken
away and strangers would have them, . . . and [she] had better
do what they told [her] if [she] wanted to see [her] kids
again."  372 U.S. at 531.

[8] In Novo, "[a]lthough the officers used a variety of
interrogation techniques, one that emerged approximately ninety
minutes into the interview was that this would be Novo's 'only

distinguishable and simply do not support his claim of error.

Again, in a thoughtful memorandum, the motion judge ruled that Pabon's statements had been made voluntarily and that he had made a knowing, intelligent, and voluntary waiver of his Miranda rights.  The judge rightly concluded that the detectives' explanations respecting the different offenses of murder and manslaughter and the different degrees of murder, as well as their comments about the evidence, neither undermined Pabon's Miranda waiver nor amounted to coercion so as to render the statement involuntary as matter of law.  We agree and conclude that the judge correctly denied Pabon's motion to suppress the statement he gave while in custody.

2.  <u>Youthful offender</u>.  Mitchell, who was sixteen years old at the time the victim was killed, was tried and sentenced as an adult in Superior Court.  Like the defendant in <u>Commonwealth</u> v. <u>Okoro</u>, 471 Mass. 51 (2015), he argues that the youthful offender transfer scheme and statutory sentencing provisions are

---

opportunity' to offer an explanation for why he hit [the victim].  Once introduced, this now-or-never theme persisted up to and through Novo's confession.  Soon after it was introduced, [the police officer] explicitly linked it to Novo's rights to testify and to present a defense when he told Novo, 'If you don't give us a reason, Roy, if you don't give us a reason right now why you did this, a jury's never going to hear a reason.'  Thereafter, [the officer] repeatedly conveyed the message that, unless Novo offered a reason for injuring [the victim] during the interview, he would not be able to offer any reason to a jury at a subsequent criminal case."  442 Mass. at 267-268.

unconstitutional as applied to him.[9] In his appellate brief,

Mitchell relies upon, inter alia, Miller v. Alabama, 132 S. Ct.

2455 (2012), and Diatchenko v. District Attorney for the Suffolk

Dist., 466 Mass. 655 (2013), for the proposition that the

statutory scheme is unconstitutional in particular because it

does not differentiate juvenile homicide offenders from adult

homicide offenders for purposes of sentencing.[10] His argument is

foreclosed at the outset by his failure to raise it below.

However, even had he done so, his argument would fail in light

of the court's holding in Okoro. Okoro, which was released

after the briefs were filed in this appeal, addressed Mitchell's

argument precisely and rejected it. While acknowledging that

"certain language in Miller can be read to suggest that

individualized sentencing is required whenever juvenile homicide

offenders [face] a sentence of life in prison," 471 Mass. at 56,

the court nonetheless squarely held that the sentence of life

---

[9] Pabon joins in Mitchell's argument. Pabon was seventeen years old at the time of the murder in 2007. In 2010, at the time of trial, the various statutes concerned with the trial and sentencing of juveniles applied only to children who were under the age of seventeen at the time of the offense. See Commonwealth v. Okoro, 471 Mass. at 55 n.4.

[10] Both Mitchell and Pabon were sentenced to life in prison with a possibility of parole after fifteen years. See Okoro, 471 Mass. at 55 n.4. As to Pabon's complaint with respect to his sentence, see ibid., discussing the various amendments to the sentencing laws and their effect on persons aged seventeen or eighteen years old at the time of the offense. See also Diatchenko v. District Attorney for the Suffolk Dist., 466 Mass. at 661-667, holding that Miller will be applied retroactively.

imprisonment mandated by the Legislature under G. L. c. 265, § 2, and G. L. c. 119, § 72B, for a juvenile offender convicted of the crime of murder in the second degree does not violate either the Eighth Amendment to the United States Constitution or art. 26 of the Massachusetts Declaration of Rights.[11]  Okoro, 471 Mass. at 58.

3.  Admission of Goode's redacted statement.  Goode's statement to the police was redacted to exclude any reference to his co-defendants in order for it to be used against him in the joint trial.  Both at the time the redacted statement was admitted and in the final charge, the judge instructed the jury that Goode's statement must be considered solely as evidence in the case against him, and not against his codefendants.

a.  Bruton.  In line with their objections raised during the trial, Mitchell, Pabon, and Ortiz now contend that the admission of Goode's redacted statement is at odds with the teaching of Bruton v. United States, 391 U.S. 123, 137 (1968).[12]

---

[11] Mitchell's counsel agreed at oral argument that the teaching of Okoro is controlling here.

[12] Mitchell objects specifically to Goode's statement (as recounted by Detective McLaughlin) that "he himself never shot or stabbed anyone, but that two people stabbed the victim.  All the while, Goode was trying to stop them."  Mitchell also challenges Goode's statement that "[t]hat dude wasn't supposed to die."

Pabon objects to the admission of Goode's statement indicating that "'someone' had problems stemming from a beating

Bruton held that the admission, at a joint trial, of a non-testifying codefendant's earlier statement, naming and directly incriminating another defendant, violates a defendant's right to confront his accusers under the Sixth Amendment to the United States Constitution. See Gray v. Maryland, 523 U.S. 185, 196-197 (1998); Commonwealth v. James, 424 Mass. 770, 782 (1997); Commonwealth v. Vasquez, 462 Mass. 827, 841 (2012); Commonwealth v. Rivera, 464 Mass. 56, 69 (2013). In the defendants' view, their cases ought to have been severed. We review the denial of a motion for severance for an abuse of discretion. Commonwealth v. Rivera, supra at 71.

Here, there was no Bruton violation because Goode's redacted statement did not name expressly, implicate, or obviously refer to the codefendants so as to be "facially"

_____

that 'that person' took at the Woodrow Wilson School[; and] . . . at the very beginning of the incident . . . [the victim] and 'someone else' had squared off and were 'ready to go' in a fight." In Pabon's view, his own statement (that he had suffered a beating sometime earlier at the Woodrow Wilson School; that he had gone "toe-to-toe" with the victim in a fair fight, and that he had chased the victim), combined with Goode's redacted statement, "clearly inculpated Pabon as both . . . the person [with the problem] at the Woodrow Wilson School and . . . the person who initially squared off to fight the victim."

Ortiz's objection relates to what he perceives as the unfair sanitizing of Goode's statement, leaving Ortiz as a possible offender, once Mitchell's and Pabon's names were redacted. He also objects to the fact that a portion of Goode's statement actually exculpated Ortiz but was excluded as hearsay ("[The detective] asked him about Pedro's involvement and he stated, 'Pedro didn't stab him. I didn't see "P" [Pedro] hit the kid'"). We address that argument infra.

incriminating.  Gray v. Maryland, 523 U.S. at 196-197.  Nor were any of the three defendants necessarily inculpated by inference from the Goode statement itself, particularly given the admittedly large number of individuals present on Wilcock and Havelock Streets that evening.  See Commonwealth v. Vasquez, 462 Mass. at 843-844, and cases cited ("There were six participants in the killing, and [the codefendant's] use of the phrase 'other members' does not necessarily encompass everyone else [including (the defendant)], as for instance the phrase 'all the other members' might connote. . . .  The phrase 'other members' signifies only some other members, without specifying who or how many.  Unlike Bruton and Gray, where there were only two perpetrators and it was immediately apparent to the jury that the codefendant's confession, redacted or not, referred directly to the defendant [Bruton and Gray, respectively], [the codefendant's] statement cannot be understood to refer directly to [the defendant].  [The codefendant's] statement alone does not support an inference that [the codefendant] was referring to [the defendant].  Other evidence was required to link [the defendant] to the crime, and it did").  Contrast Commonwealth v. Bacigalupo, 455 Mass. 485, 493 (2009) (where the witness recounting the codefendant's confession referred to the defendant as the codefendant's "friend," the court concluded that the reference to the "'friend' suggested to the jury that

[the codefendant] was referring to the defendant. This implication was strengthened by the fact that only two people were on trial for the shootings that [the codefendant] said were committed by himself and a 'friend.'").

This case is easily distinguished from Bacigalupo. Here, the redacted statement could be considered incriminating, if at all, only when taken in context with other evidence admitted at the joint trial. The law is clear that "inferential incrimination can be properly cured by a limiting instruction," which the trial judge timely and forcefully delivered here. Rivera, 464 Mass. at 70. We see no error.

b. Verbal completeness. Nor was there a violation of the common-law rule of verbal completeness, as the defendants have argued.[13] For other portions of a redacted statement to be admissible under the rule of verbal completeness, the additional text must be "(1) on the same subject as the admitted statement; (2) part of the same conversation as the admitted statement; and (3) necessary to the understanding of the admitted statement" (emphasis omitted). Commonwealth v. Clark, 432 Mass. 1, 14 (2000).

---

[13] It is not clear precisely what Pabon's argument on verbal completeness entails as his brief merely adopts Ortiz's argument -- which was, on this issue, only that Goode's statement exculpating Ortiz was wrongly redacted.

In this case, Goode's statement was redacted to remove not only the names of those Goode inculpated, but also that portion of Goode's statement exculpating Ortiz (see note 12, supra). This presents an unusual circumstance.  Although the statement was admitted only against Goode, it is not just the affirmative statement but the implication of the redaction of the exculpatory portion that, Ortiz argues, left the impression that Ortiz might have been one of the people Goode implicated when in fact Goode did not do so.  And, although it is true that the portion of the statement exculpating Ortiz was hearsay -- and no part of the statement would have been admitted had Ortiz been tried alone -- the admission of the inculpatory portion without the admission of the exculpatory portion, Ortiz argues, created in this case the misimpression that Goode might have inculpated Ortiz.

Nonetheless, even assuming what we do not decide -- that, when combined with the required redactions of the names of those inculpated, the redaction of the portion of Goode's statement exculpating Ortiz violated the doctrine of verbal completeness or was otherwise unfair to Ortiz -- we think any error was cured by the judge's forceful and repeated instructions that a statement by any of the defendants was to be considered only with respect to that defendant, not with respect to any of the other defendants.  In Commonwealth v. Keevan, 400 Mass. 557, 570

(1987), the Supreme Judicial Court held that "absent any direct inculpation, an appropriate instruction is sufficient to obviate Bruton concerns," and we think the same is true with respect to the type of error claimed here.

4. Admission of Pabon's redacted statement to police. Based on Bruton and the verbal completeness rule, Ortiz and Mitchell also assert error in the admission of Pabon's taped (albeit redacted) statement to the police at his home on June 19, 2007. Mitchell argues that Pabon's comment ("Markeese wasn't with us"), which was excised from the admitted statement, was unfairly suppressed.

Ortiz concedes that Pabon's redacted statements "were not as unfair to" Ortiz's own defense as was Goode's statement.[14] However, he points out that Pabon had indicated to the police that he had no knowledge of Ortiz's involvement in the incident, just as he had no knowledge of other named uncharged individuals, so that the jury ought to have heard that Ortiz was classified by Pabon in the "I don't know" category rather than

---

[14] The redacted statement was as follows:

"Pabon was asked specifically about several people . . . 'Ace -- I don't know; Mills -- heard he was locked up last night; and Pudge -- I don't know.'"

In the original statement, Pabon had also stated, "K-EZ -- you got him; . . . Pedro [i.e., Ortiz] -- I don't know; . . . PJ -- heard he was locked up last night."

the "you [i.e., the police] got him" classification, which included Mitchell.

Both Mitchell's and Ortiz's arguments fail for the same reason that the objections to Goode's statements fail. Moreover, it does not appear to have been possible to amend Pabon's statements in such a way that both satisfied Bruton and met the demands of Ortiz and Mitchell for verbal completeness. See Commonwealth v. Rivera, 464 Mass. at 71.

5. Evidentiary rulings. a. Admission of Pabon's denials. Pabon claims error in the admission of his denials of culpability contained in his first (June 19, 2007) police statement, admitted at trial, and in McLaughlin's testimony about Pabon's second statement (custodial interrogation on March 1, 2008). He argues that he was prejudiced by the fact that the jury heard his denials of various accusations posed by the police. The claim lacks merit. It is clear that Pabon's extrajudicial statements, made during both exchanges with the detectives, were neither absolute nor unequivocal denials and, surely, had ample probative value that outweighed any possible prejudice to him. See Commonwealth v. Spencer, 465 Mass. 32, 47 (2013). There was no abuse of discretion in admitting this evidence.

b. Pabon's two knives found at arrest. At the time of Pabon's arrest, the police found that he possessed two knives.

The trial judge allowed McLaughlin to testify that, in Pabon's postarrest statement, Pabon was asked why he had two knives and Pabon responded that he had never stabbed anyone and it was better than carrying a gun.  Pabon argues that the admission of this evidence was error.  We disagree.  The two knives, in his possession at the time of his arrest, were "relevant to show that [Pabon] had the means of committing the offense." Commonwealth v. James, 424 Mass. 770, 779 (1997).  It clearly was within the judge's discretion to admit knives in the defendant's possession that could have been used in the murder. See Commonwealth v. Rosa, 468 Mass. 231, 237-238 (2014).  See also Commonwealth v. Daye, 435 Mass. 463, 474-475 (2001) ("Subject to the discretion of the judge, 'it is commonly competent to show the possession by a defendant of an instrument capable of being used in the commission of the crime, without direct proof that that particular instrument was in fact the one used.'  Commonwealth v. Toro, 395 Mass. 354, 356 [1985], quoting Commonwealth v. O'Toole, 326 Mass. 35, 39 [1950]").

c.  Evidence about the investigation.  Citing Commonwealth v. Stuckich, 450 Mass. 449 (2008), the defendants also argue that the prosecutor improperly elicited testimony from McLaughlin about the nature of the police investigation that resulted in the arrest of the defendants only and not other individuals who may have been present.  This argument is

misplaced for at least two reasons. First, throughout the trial, the defense vigorously attacked the adequacy of the police investigation, placing the investigation clearly at issue. See Commonwealth v. Arana, 453 Mass. 214, 226-227 (2009). In addition, the court's concern in Stuckich, a rape and indecent assault and battery case, was that "[t]he fact that the Commonwealth brought its resources to bear on this incident create[d] the imprimatur of official belief in the [alleged rape victim]. It is unnecessary and irrelevant to the issue of the defendant's guilt." 450 Mass. at 457. No similar considerations apply in this case, where the fact that the victim was murdered was not contested.

The defendants' argument that the prosecutor should not have been permitted to elicit testimony that some of the witnesses were reluctant to testify and that one witness testified on redirect examination that she was "scared" also fails. See Commonwealth v. Fitzgerald, 376 Mass. 402, 411 (1978) ("[I]n general, questions and arguments concerning a witness's fear in testifying are not improper per se. They would be improper only if there were some ground, other than that they dealt with fear, for finding impropriety"). See also Commonwealth v. Auguste, 418 Mass. 643, 647 (1994).

6. Prosecutor's closing argument. The defendants assign as error certain remarks that the prosecutor made in his closing

argument to the jury. Specifically, Ortiz argues that the prosecutor improperly argued that the Commonwealth witnesses "were credible because they had been reluctant to appear or to identify the defendants out of fear." In fact, that portion of the prosecutor's argument was offered in the permissible context of asking the rhetorical question, "What possible motive does [the witness] have to come in here and lie to you?" "A prosecutor can address, in a closing argument, a witness's demeanor, motive for testifying, and believability, provided that such remarks are based on the evidence, or fair inferences drawn from it, and are not based on the prosecutor's personal beliefs. . . . When credibility is an issue before the jury, 'it is certainly proper for counsel to argue from the evidence why a witness should be believed.' Commonwealth v. Raymond, 424 Mass. 382, 391 (1997), quoting Commonwealth v. Thomas, 401 Mass. 109, 116 (1987)." Commonwealth v. Freeman, 430 Mass. 111, 118-119 (1999). Moreover, as discussed supra, a witness's fear about testifying is properly admitted on the issue of the witness's credibility.

Ortiz and Pabon also argue that the prosecutor's statement, "So they waited and they waited until he got out, and until he was brought to Havelock Street, and then, and only then did they exact their revenge upon him," was based on a fact not in evidence. In support, they note that the date the victim was

released from custody after being arrested for slashing Jaleek Leary was not in evidence. However, as the Commonwealth responds, the argument that the opportunity for revenge arose at the moment when the victim was brought to the Wilcock/Havelock Street area clearly was supported by the evidence -- and that event obviously occurred after the victim had been released from custody, whenever the release occurred.

Mitchell contends that the prosecutor's argument that Mitchell said, as he wiped the knife on the pole, "That's what he gets," was not supported by the evidence. However, the prosecutor's statement was supported by the fact that at least one witness identified Mitchell as the person who wiped the blood on the street pole ("And I seen Markeese walking past my house and Markeese was wiping the blood on a pole"). At another point, the same witness testified that soon afterwards Mitchell and another individual walked away and she heard one of them -- she couldn't remember which -- say, "[T]hat's what you get." Another witness testified that Mitchell walked away from the scene alone, carrying a knife, and then "wiped the blood on the pole." Even if the prosecutor's inference was strained -- i.e., that it was a leap to conclude that it was Mitchell who said, "That's what you get" after wiping the blood -- such a misstatement cannot be said to have created a substantial risk of a miscarriage of justice here.

Mitchell also argues that the prosecutor impermissibly argued, without a basis in evidence, that the case was "about revenge and retaliation . . . and these four defendants' conscious and deliberate decisions on May 22 of 2007 . . . to get Terrance Jacobs up to Havelock Street, to get him back for stabbing their friend and relative Jaleek Leary." In fact, the evidence supported the argument that there was a plan to "get back" at the victim for slashing Leary. Moreover, the prosecutor did not argue that the plan at the outset was to murder him.

Finally, Ortiz, Pabon, and Mitchell all challenge the prosecutor's argument that "all the defendants armed themselves with knives in anticipation of confronting Terrance Jacobs." In fact, because there was evidence that each of the four defendants stabbed the victim, the statement that each armed himself with a knife was supported in the evidence. To the extent that the wording of the prosecutor's argument implied that there were at least four knives and that each defendant began the confrontation with a knife, that conclusion is not unreasonable given the speed with which the confrontation escalated and the number of times the victim was stabbed. Moreover, even if the inference that each defendant had a knife at the beginning of the confrontation is not fully supported,

that variation is not material and cannot be said to have created a substantial risk of a miscarriage of justice.

"Where, as here, the defendant[s] did not object to these closing argument statements at trial, we determine whether the statements created a substantial likelihood of a miscarriage of justice that requires a new trial."  Commonwealth v. Penn, 472 Mass. 610, 626 (2015).[15]  "In determining whether an argument was improper, we examine the remarks 'in the context of the entire argument, and in light of the judge's instructions to the jury and the evidence at trial.'  Commonwealth v. Gaynor, 443 Mass. 245, 273 (2005), quoting Commonwealth v. Viriyahiranpaiboon, 412 Mass. 224, 231 (1992)."  Commonwealth v. Miller, 457 Mass. 69, 79 (2010).  We have carefully reviewed the defendants' contentions and the transcript of the prosecutor's closing.  We see no error, and certainly no substantial risk of a miscarriage of justice.  "A 'prosecutor is entitled to argue the evidence and fair inferences to be drawn therefrom.'  Commonwealth v. Paradise, 405 Mass. 141, 152 (1989)."  Commonwealth v. Deane, 458 Mass. 43, 55-56 (2010).  Finally, we have in mind the judge's instruction to the jury that "[t]he opening statements and the closing arguments of the lawyers are not evidence . . .

---

[15] Two of the defendants did object to other statements in the prosecutor's closing argument.  They do not argue those issues on appeal.

if anything they said about the evidence differs from your memory of the evidence, it is your memory that controls."

7. Proposed instructions on withdrawal from joint venture. The trial judge correctly refused the defendants' request to charge the jury on the subject of withdrawal from a joint venture.[16] To advance a theory of abandonment or withdrawal from a criminal joint venture, Massachusetts law requires that "there must be at least an appreciable interval between the alleged termination and [the commission of the crime], a detachment from the enterprise before the [crime] has become so probable that it cannot reasonably be stayed, and such notice or definite act of detachment that other principals in the attempted crime have opportunity also to abandon it." Commonwealth v. Rivera, 464 Mass. 56, 74 (2013), quoting from Commonwealth v. Miranda, 458 Mass. 100, 118 (2010). None of the defendants was entitled to an instruction as to joint venture withdrawal because there was no evidence to support such a hypothesis. Contrast Commonwealth v. Allen, 430 Mass. 252, 257-258 (1999).

8. Fidler motion. The defendants argue that they presented a colorable claim that a juror was biased and that the trial judge erred when she denied their motion for an opportunity to question the juror. See Commonwealth v. Fidler,

---

[16] Ortiz also objects to the giving of a joint venture instruction pursuant to Commonwealth v. Zanetti, 454 Mass. 449 (2009). We see no error.

377 Mass. 192 (1979). After holding an evidentiary hearing, the trial judge denied the motion in a ten-page decision, recounting the facts in considerable detail, along with her reasons for crediting parts of Ortiz's hearing testimony and discrediting other parts. The basis for the motion apparently was a suspicion that one juror might have been related to an individual with whom Ortiz was incarcerated; Ortiz had concluded, from the individual's hostility to Ortiz, that the individual was associated with a gang "that ha[d] an alliance with" the victim's gang. In addition, the juror might have attended high school with an aunt of the victim. The juror also lived within a mile of the incident, a fact she disclosed before she was empanelled. The defendants presented no witnesses with any personal knowledge of any of the suspected associations.

The judge concluded that the defendants had failed to make a "colorable showing" of either extraneous influence or bias on the part of the juror in question. We agree. An impartial jury is, without question or doubt, fundamental to an accused's right to a fair trial. A balancing principle, however, is that the questioning of a juror, postverdict, is a "sensitive undertaking and is fraught with potential for error." Commonwealth v. Connor, 392 Mass. 838, 843 (1984). In the end, "[a] trial judge has 'broad discretion "to determine what manner of hearing, if any, is warranted."'" Commonwealth v. Dixon, 395 Mass. 149, 151

(1985), quoting <u>United States</u> v. <u>Campbell</u>, 684 F.2d 141, 151 (D.C. Cir. 1982). 'No duty to investigate arises unless the court finds some suggestion or showing that extraneous matters were brought into the jury's deliberations.' <u>Commonwealth</u> v. <u>Dixon</u>, <u>supra</u>, citing <u>Commonwealth</u> v. <u>Fidler</u>, 377 Mass. 192, 203 (1979). The party seeking the inquiry must show more than mere speculation. <u>Commonwealth</u> v. <u>Dixon</u>, <u>supra</u> at 152." <u>Commonwealth</u> v. <u>Rivera</u>, 464 Mass. at 80-81. We see no abuse of discretion.

We affirm the judgments and the order denying the defendants' postconviction motion.[17]

<u>So ordered</u>.

---

[17] We have carefully considered each of the arguments presented in the defendants' briefs. To the extent that any particular claim has not been addressed specifically herein, we have found it to be without merit. See <u>Commonwealth</u> v. <u>Domanski</u>, 332 Mass. 66, 78 (1954).