NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

20-P-747                                          Appeals Court
20-P-767
20-P-808


COMMONWEALTH  vs.  MARKEESE MITCHELL (and two companion cases[1]).


Nos. 20-P-747, 20-P-767, & 20-P-808.

Suffolk.     December 2, 2022. – July 10, 2023.

Present:  Wolohojian, Henry, & Hershfang, JJ.


Homicide.  Jury and Jurors.  Evidence, Bias, Disclosure of
    evidence.  Practice, Criminal, New trial, Jury and jurors,
    Voir dire, Challenge to jurors, Investigation of jurors,
    Conduct of juror, Disqualification of judge.


    Indictments found and returned in the Superior Court
Department on April 18, 2008.

    Motions for a new trial, filed on June 11 and July 5, 2018,
were heard by Judith Fabricant, J., and a motion for
disqualification, filed on June 18, 2020, was considered by her.


    Cathryn A. Neaves for Markeese Mitchell.
    Richard B. Klibaner for Pedro Ortiz.
    Brooke Hartley, Assistant District Attorney, for the
Commonwealth.
    Richard L. Goldman, for Terrance Pabon, was present but did
not argue.


    [1] One against Terrance Pabon and one against Pedro Ortiz.

WOLOHOJIAN, J.  In these gang-related retaliatory murder cases, a juror did not disclose that she had a half-brother who was serving a sentence for a similar crime.  The posttrial discovery of this information eventually led to so-called Fidler motions, see Commonwealth v. Fidler, 377 Mass. 192, 200-201 (1979), and to motions for a new trial.  The main question presented here is whether the judge, who had also been the trial judge, erred in denying the motions for a new trial after crediting the juror's explanation, made under oath during an evidentiary hearing, for her nondisclosure.  In addition, the defendants argue that the judge should have disqualified herself from hearing the motions because she had written a letter in support of the lead trial prosecutor's application to become a Superior Court judge, and because of her interactions with him after he was appointed to the bench.  We conclude that the judge did not err in denying the motions for a new trial given the judge's credibility determinations concerning the juror's testimony at the Fidler hearing, and given the judge's other findings of fact.  We also affirm the judge's order denying the motion to disqualify.  The performance of the prosecutor was not at issue in any of the matters pending before the judge.

Background.  The facts as they could have been found at trial are set forth in this court's opinion affirming the judgments.  See Commonwealth v. Mitchell, 89 Mass. App. Ct. 13,

cert. denied, 580 U.S. 899 (2016) (Mitchell I). In brief, the defendants were friends and relatives of Jaleek Leary, whose face had been slashed by Terrance Jacobs, who was associated with the M.O.B. gang. In retaliation for that event, a fight was arranged between a group associated with the Wilcock Street area, which included the defendants, and Jacobs, who was lured to the spot. The defendants stabbed and beat Jacobs to death.

The defendants, together with Paul Goode (who is not a party to this appeal), were charged with murder in the first degree for Jacobs's death. The case went to trial in April 2010, and began with a multiday jury empanelment process about which the defendants claim no procedural error. Juror no. 15 (juror) was seated on the fifth day of empanelment. As part of that process, the judge carefully explored a multitude of sources of possible bias. Among other things, the judge described the case to see whether anything about it would cause any member of the venire to have difficulty being fair and impartial to both sides:[2]

---

[2] The judge defined the concept of fairness and impartiality for the venire as follows:

"Being fair and impartial doesn't necessarily require that you've never had any experiences, or read anything or heard anything, or had any thoughts or opinion on any subject that might be relevant. There probably wouldn't be a lot of people who would fit that description. Being fair and impartial requires that you can, and you will, put aside any experiences or anything you may have read, or

"This case arises from an incident that occurred on May 22nd of 2007, on Havelock Street in Dorchester. The Commonwealth alleges that on that date, in that place, that each of these four defendants participated in stabbing Terrance Jacobs, causing his death."

The judge also informed the venire that there "may be evidence with respect to the events in issue here relating to retaliation for another incident of violence that may have occurred at an earlier time" and asked whether that would affect anyone's ability to be fair and impartial. In addition, the judge inquired whether any venire member would have difficulty being fair and impartial if there were "evidence regarding interactions among certain individuals in the Mattapan and Dorchester areas of Boston, and particularly in the areas of Columbia Road, Wilcock Street, Havelock Street and Blue Hill Avenue."

The judge also explored the topic of the juror questionnaire, which the members of the venire had completed

---

heard, or thought about relevant subject matter and that you will decide the facts of this case based solely on the evidence that will be presented in the trial of this case.

"Being fair and impartial also requires that you can, and you will, apply to the facts that you will find from the evidence, the law as I will instruct you, even if that isn't what you thought the law was, even if it isn't what you think the law should be, that you can, and you will, apply the law as I will instruct you to the facts that you will find from the evidence presented in this trial. That's what we mean by being fair and impartial to all parties in this case."

before being called up to the court room or learning anything about the case. The judge repeated the questions on the questionnaire, and told the venire that if they had omitted anything -- for whatever reason -- they should bring it to the judge's attention when questioned individually. Of relevance here, the judge focused on the question that asked, "Have you, or anyone in your household or family, ever had any of the following experiences with the law," and listed, among other things, being arrested, being convicted of a crime, and being a witness in a civil or criminal case. The juror answered this question "no." With respect to this question, the judge emphasized the need for full disclosure, and specifically stressed that responsive information should not be omitted simply because the venire member believed the information was irrelevant.[3]

_____

[3] The judge explained:

"This is an area where a lot of people leave something out, perhaps because something happened a very long time ago, or it seems completely irrelevant, or it was dismissed, or it was when you were a juvenile, or for any of a number of reasons people leave something out.

"It is very important that we have a complete and accurate answer to this question, even if you think it's really irrelevant. Indeed, it may be irrelevant, but we need to know the information so that we can make a judgment about whether it has any relevance."

The juror did not indicate an affirmative response to any of the judge's questions to the venire. When the juror was called to sidebar for individual questioning, she confirmed that she could be fair and impartial to both sides, and stated that she had nothing further to disclose. When asked whether the location of the crime on Havelock Street would have any bearing on her ability to be fair and impartial, she responded that it would not. And she explained that she lived "on the other side, more on the street side so it's nowhere near there." The judge found the juror indifferent, and all parties stated that they were content with the juror.

Shortly thereafter, the judge received information from the Commonwealth's investigator that the juror had been involved in a minor motor vehicle criminal matter in the Dorchester Division of the District Court Department in 2008 that had resulted in a fine, which she had not disclosed on the juror questionnaire. When asked by the judge why she had not disclosed the information on the questionnaire, the juror explained that she did not believe the information was relevant since the earlier matter had been dismissed, and that she did not think "it would affect anything." In response to follow-up questioning by the judge, the juror again stated that she believed that she could be fair and impartial to all parties in this case. The judge determined that there was no reason to excuse the juror for

cause,[4] neither side requested that she do so, and no one exercised a peremptory challenge. The juror was accordingly seated and, after a lengthy trial, was a member of the jury that, in May 2010, convicted all four defendants of the lesser charge of murder in the second degree.

Two and one-half years later, in December 2012, the defendants filed a joint motion pursuant to Fidler, 377 Mass. at 200-201 (first Fidler motion), seeking to subpoena the juror. The basis for the motion was that the juror had failed to disclose that (1) her half-brother, Karl, was incarcerated and was associated with the Lucerne Street Doggz, a gang that had an alliance with M.O.B., the gang with which the victim in this case was associated; (2) she had a half-sister, Shantel, who had served as a witness in a murder trial a year before the trial in this case; (3) her answer regarding her familiarity with the location of the crime was "oblique" and not forthcoming; and (4) she had waved during the trial to an aunt of Terrance Jacobs, who was a spectator at the trial and with whom she had attended high school. The defendants argued that the juror was biased against them and that she concealed information during empanelment in a deliberate effort to be seated so as to convict

---

[4] The judge noted that the juror had not been arrested, that she did not understand she had been charged with a crime, and that the judge was persuaded that the juror could be fair and impartial.

them.  The defendants had learned about the juror's connection to Karl after the trial when defendant Ortiz and Karl had exchanged words while incarcerated at the same prison, and Karl had said something to the effect that "that's why my sister convicted you."

After an evidentiary hearing, the judge denied the first Fidler motion, concluding:

> "Overall, the evidence fails to establish any basis to believe either that the juror had any bias against the defendants, or that she concealed anything from the Court during [e]mpanelment.  If she shares a biological father with Karl and Shantel . . . , nothing indicates either that she could fairly be expected to consider them members of her 'household or family' for purposes of the question on the juror questionnaire, or that she had any awareness of their experiences with the legal system.  As to [Jacobs's aunt], even if she and the juror attended the same high school for some period of time, and even if the juror waved to her in the court room, nothing indicates that the juror had any awareness of any relationship she might have had with Terrance Jacobs, or that their acquaintance would have given rise to any bias in the juror.  Nor does the juror's residence approximately a mile from the location of the incident suggest any bias."

The judge's denial of the first Fidler motion was affirmed in an appeal that was consolidated with the direct appeals of Mitchell's, Pabon's, and Ortiz's convictions.[5]  See Mitchell I, 89 Mass. App. Ct. at 30-31.

Thereafter, in 2017 and 2018, Mitchell, Pabon, and Ortiz each renewed their Fidler motion based on newly-discovered

---

[5] Goode's appeal was severed.

information, and also filed motions for a new trial.  The new information was in the form of social media postings that postdated the trial by several years and tended to show that the juror considered herself to have a family relationship with Karl and Shantel.  Based on this new information, the judge brought the juror into court for questioning, which the judge conducted herself based on questions previously submitted by the defendants -- the procedure endorsed in Fidler, 377 Mass. at 202-203.[6]

In a detailed memorandum of decision, the judge set out her findings and rulings on the motions for a new trial.  She found "the juror's testimony to be a candid and honest presentation of the facts as she believe[d] them to be," and the judge credited and relied on the juror's testimony in making her findings. Those findings were:

> "The juror has several younger half-siblings on her father's side, including two who are relevant here, Karl . . . , and Shantel . . . .  Karl and Shantel have the same mother, and grew up living with their mother, while the juror lived with her own mother.  The juror has never shared a household with either Karl or Shantel.  Shantel is some fourteen months younger than the juror, and Karl is almost four years younger than the juror.  During their childhood,

---

[6] Before deciding to call the juror in for questioning, the judge conducted a nonevidentiary hearing and requested that further nonintrusive investigation be conducted cooperatively between the district attorney's office and defense counsel. This cautious step-by-step approach reflected the judge's effort to develop the necessary facts while avoiding harassment or exploitation of the juror.  See Fidler, 377 Mass. at 202.

their father made efforts to bring his children together and encouraged them to form relationships. Those efforts achieved some degree of success, more as between the juror and Shantel, who were close at times, than between the juror and Karl, whose relationship, in the juror's words, was 'on and off.' Karl has at times used a nickname of 'Pops.'

"In September of 2007, Karl was arrested in connection with a shooting in Dorchester.  An article in the Boston Herald [newspaper], dated September 29, 2007, reported the following:

'A police source identified one of the [juvenile shooter's] accomplices, Karl . . . , 18, of Dorchester, as leader of the Lucerne Street Doggz, which earlier this year was hit by federal authorities who arrested more than a dozen members in a sweep.  However, since the raid, Lucerne Street has remained active, with cops linking several shootings to the gang including an Aug. 18 hit on Morse Street that left three teens wounded.

'Police sources said [Karl], who was arrested in July for a daylight brawl on the steps of Dorchester District Court, has been linked to four recent shootings.

'He was held on $100,000 cash bail yesterday and had his bail revoked for the July assault and battery charge.'

"The juror read the article at or about the time it appeared.  She had not previously heard of the Lucerne Street Doggz, and had no awareness of it or of any involvement Karl may have had with it.  Sometime after she read the article she discussed it with Karl's mother, who confirmed that Karl was incarcerated and shared some information about the charges against him.  The juror did not receive any information from Karl's mother, or from any other source other than the Herald article, about any involvement Karl may have had with the Lucerne Street Doggz, or any other gang-related activity.  Nor did she learn of any connection, either friendly or

hostile, between the Lucerne Street Doggz and any other gang or group.

"Paul [B.], the father of the juror's child, came to know and to be friends with Karl through the juror. As of the time of [e]mpanelment in April of 2010, the juror's intimate relationship with [Paul B.] had ended, although she still had some interaction with him related to their child. As of the time of [e]mpanelment, the juror had never heard anything from [Paul B.] regarding any gang activity, or any involvement of Karl in any such activity. After the trial had concluded, the juror told [Paul B.] and others that she had served on a murder trial. She did not discuss with [Paul B.] any further details about the trial, or about the event that gave rise to it, until years later.

"Karl was convicted of various offenses on August 19, 2009, and sentenced to 4-5 years in state prison, where he remained through the time of this trial. The juror never visited him in any facility or otherwise communicated with him at any time during his incarceration. As of April 19, 2010, when she appeared for [e]mpanelment, the juror had not seen, corresponded with, spoken with, or communicated in any form with Karl since prior to his arrest in September of 2007. She knew that he was incarcerated, and had heard some information about his offenses, but her only information regarding any gang involvement that he may have had was from the reference to the Lucerne Street Doggz in the Herald article some two and one-half years before. At the time of empanelment, the juror had no bias or opinion or loyalty relating to the Lucerne Street Doggz, anyone associated with Wilcock Street, or any other gang or group. She had never heard of MOB, had no information about it, and had no bias or opinion or loyalty relating to it.

"The juror and her half-sister Shantel were relatively close at times as they were growing up, but grew apart in their teenage years, first when the juror became a mother, and then when Shantel went to college in Florida in around 2006. At the time of [e]mpanelment in this case, Shantel had returned from Florida, and the juror was in communication with Shantel 'here and there.' Shantel testified under a

grant of immunity at the trial of a homicide case in Suffolk Superior Court in 2009, arising from an event that occurred on December 31, 2006. The juror was not aware of that case, or of Shantel's involvement, either at the time it occurred or at the time of [e]mpanelment in this case. She learned about it, although not in detail, some years later.

"At [e]mpanelment in this case on April 19, 2010, the juror checked the 'no' box on the juror questionnaire in response to the question whether she or any member of her 'household or family' had had any experience with the law. As to Shantel, the juror gave that answer because she had no knowledge at the time that Shantel had had any involvement in any case. As to Karl, the juror gave that answer because he was not a member of her household, and because, although he was a member of her family, as she testified, she 'didn't think he had any relation to this trial.' The Court credits this answer as a true reflection of the juror's thinking when she filled out her jury questionnaire.

"Karl was released from incarceration some time in 2011 or 2012. After Karl's release, the juror's relationship with him resumed, as before, 'on and off.' He would, in her words, 'check up on' her and her daughter from time to time. At some point Karl became a father, which increased the juror's interaction with him. They communicated at times by telephone or text, and saw each other occasionally at gatherings, such as a baby shower in approximately 2015, a child's birthday party, and the like. The juror posted photographs of such gatherings on social media. At some point after Karl's release, the juror heard through 'word on the street' that Karl had been involved in gang activity; she received no more detailed information than that." (Footnotes omitted.)

The judge credited the juror's testimony that she had no actual bias and that the juror had no knowledge of anyone who was connected to her having any connection to the victim in this case or to any gang with which the victim may have been

affiliated. The judge concluded that the three defendants failed to show actual or implied bias on the part of the juror.

The judge acknowledged that the juror's answer on the juror questionnaire was inaccurate because it failed to disclose that two members of her family, although they were not part of her household, had experience with the law. But the judge found that the inaccuracy was not dishonest because "it did not arise from any motive to mislead or conceal, but was based on the juror's independent evaluation of relevance." The judge noted that the juror's independent evaluation in this regard had violated the judge's instruction to disclose all responsive information regardless of the juror's view of relevance. But the judge concluded that the juror's judgment was not unreasonable given the limited information the juror had about her half-brother and about the facts of this case at the time she answered the juror questionnaire.

In addition, the judge found that, even if the juror had answered the questionnaire correctly, the accurate disclosure would not have given rise to a viable challenge for cause. The judge determined that, in light of the juror's limited knowledge at the time, an accurate disclosure would have revealed only that the juror's half-brother, with whom she had an on and off relationship, had been convicted of crimes. Although the judge acknowledged that the juror might have related what she had read

about her half-brother in the Boston Herald two and one-half years earlier, the judge stated that she "would not likely have relied on [the juror's] recitation of a media report, and nothing before the [judge] at the time indicated any relevance the Lucerne Street Doggz might have had to the case."

The judge also discredited defendant Ortiz's affidavit in which he asserted that "there was a violent rivalry between members of the Lucerne Street/MOB gang and residents of Wilcock Street," because Ortiz provided no basis of knowledge for this assertion and had distanced himself from gang activity at trial. The judge accepted that Paul B. had a basis of knowledge for the assertion in his affidavit that Lucerne Street Doggz and M.O.B. "have always been cool with each other," but concluded that this assertion would not have supported a challenge for cause. On August 10, 2018, the judge denied the motions for a new trial, and concluded that the renewed Fidler motions were moot because she had already afforded the relief they sought. The defendants timely appealed.[7]

---

[7] The appeals from the August 10, 2018 order were stayed pending the defendants' subsequent motions for juror contact and to disqualify the judge. Ultimately, the appeals from the August 10, 2018 order were consolidated with the defendants' appeals from a June 23, 2020 order denying their motions that the judge disqualify herself and for a new hearing concerning the jury before a different judge.

Thereafter, in 2019, the codefendant, Goode, filed a motion for a new trial, in which he raised a claim of prosecutorial misconduct by the lead trial prosecutor, who had become a Superior Court judge in 2017 (seven years after the trial, and after the defendants' convictions were affirmed by this court). After receiving the motion, the judge notified Goode that, in her capacity as chief justice of the Superior Court, she had had substantial interaction with the prosecutor after he had become a judge and that she had submitted a letter to the judicial nominating commission in support of his application for a judgeship based on her knowledge of his work. The judge invited submissions on whether she should disqualify herself from considering Goode's motion for a new trial. On January 13, 2020, after receiving Goode's motion to recuse, the judge recused herself from further involvement in Goode's case.

Spurred by the judge's recusal from Goode's case, the three defendants here then filed, in 2020, a joint motion to disqualify the judge and for a new Fidler hearing before a different judge. The defendants argued that the judge should have disclosed her posttrial interactions with the trial prosecutor before acting on the defendants' renewed Fidler motions, which were filed in 2017,[8] that she should have

---

[8] The defendants did not claim that there was any basis for disqualification before the judge ruled on the first Fidler

disqualified herself at that point, and that their <u>Fidler</u> motions should be reheard by a different judge.  The judge denied the motion, explaining that, unlike Goode, the three defendants here raised no issue of prosecutorial misconduct and that their <u>Fidler</u> motions were fully resolved before any such allegation had been made.  The defendants' timely appeals from this order are before us, as are their appeals from the 2018 order denying their motions for a new trial.

<u>Discussion</u>.  The defendants argue that they are entitled to a new trial because, had the juror accurately disclosed the information about her half-siblings Karl and Shantel, she would have been viably challenged for cause.  In addition, defendant Ortiz argues that the juror's inaccurate disclosures deprived him of the intelligent exercise of his right to peremptory challenges, thus entitling him to a new trial.  Separately, the defendants argue that the judge abused her discretion in denying their motion to disqualify her.

1.  <u>Motions for a new trial; juror nondisclosure of information bearing on bias</u>.  When, as here, it is discovered after trial that a juror failed to disclose information during voir dire and that failure raises a nonspeculative question

_____

motion, the denial of which was affirmed in this court's 2016 opinion affirming the convictions.  See <u>Mitchell I</u>, 89 Mass. App. Ct. at 30-31.

about the juror's impartiality, the remedy "is a hearing in which the defendant has the opportunity to prove actual bias." Commonwealth v. Amirault, 399 Mass. 617, 625 (1987), quoting Smith v. Phillips, 455 U.S. 209, 215 (1982) (Phillips). If the hearing includes examination of the juror (a Fidler hearing), it is to be supervised and directed by the judge so as prevent interrogation of the juror from exceeding its proper scope. See Fidler, 377 Mass. at 202. A judge may (as the judge here did) decide to conduct the questioning herself, allowing counsel for both parties to submit proposed questions and object to any questions the judge intends to ask. Id. at 203. "A [Fidler] hearing permits counsel to probe the juror's memory, his reasons for acting as he did, and [his] understanding of the consequences of [his] actions. A hearing also permits the trial judge to observe the juror's demeanor under cross-examination and to evaluate [his] answers in light of the particular circumstances of the case." Amirault, supra at 626-627, quoting Phillips, supra at 222 (O'Connor, J., concurring).

The "crucial inquiry" at a Fidler hearing is whether the juror's answers during empanelment were honest. Amirault, 399 Mass. at 626. See McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984) (McDonough). Honesty in this context is not the same as accuracy. An answer may be inaccurate while still being honest, depending on the juror's motivation when

giving the inaccurate answer. A lack of memory, a misunderstanding of the scope or meaning of the question, or a mistaken view that information is irrelevant, are some examples of reasons why a particular nondisclosure -- even if material -- is benign in the sense that it does not reveal juror bias. "[O]nly those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial." McDonough, supra. See Amirault, supra at 625. The determination of whether the juror's answer was honest is a question of fact that rests with the judge. Id. at 626.

It is the defendant's burden to show, by a preponderance of the evidence, that the juror was not impartial. Amirault, 399 Mass. at 626. See Faria v. Harleysville Worcester Ins. Co., 852 F.3d 87, 96 (1st Cir. 2017). To obtain a new trial based on a juror's failure to provide accurate information, the defendant "must first demonstrate that [the] juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause." McDonough, 464 U.S. at 556. See Commonwealth v. Emerson, 430 Mass. 378, 384 (1999), cert. denied, 529 U.S. 1030 (2000); Amirault, supra; Commonwealth v. Murphy, 86 Mass. App. Ct. 118, 126 (2014). "For this purpose, a voir dire question is material if a response to it 'has a natural tendency to influence, or is capable of influencing,'

the judge's impartiality determination" (citation omitted).

Sampson v. United States, 724 F.3d 150, 165 (1st Cir. 2013).

"If the judge finds that the juror answered voir dire questions mistakenly, but honestly, the analysis as to actual bias ends, and the judge must find the juror impartial."  Murphy, supra. "In the absence of clear abuse of discretion or a showing that the judge's findings were clearly erroneous, the judge's ruling [on the motion for a new trial] will not be disturbed on appeal."  Amirault, supra.

With this analytical framework in mind, we turn to the specifics of this case.  It is undisputed that the juror inaccurately answered "no" to the question whether anyone in her family or household had been arrested or convicted of a crime or had been a witness in a civil or criminal case; her half-sister Shantel had been a witness in a murder trial the year before, and her half-brother Karl was serving a sentence for serious crimes.  But there was no affirmative evidence that the juror knew that Shantel had been a witness in another case, and the judge was entitled to credit the juror's testimony that she did not know that Shantel had been so.  The defendants thus failed to demonstrate that the juror's answer was not honest with respect to Shantel; juror bias is not established when a juror fails to disclose a material piece of information if the reason for the nondisclosure is that she did not know it.

The judge also credited the juror's testimony about Karl. The juror knew that Karl was incarcerated, and she had some knowledge of the nature of his offenses from having read an article in the Boston Herald over two years earlier. That article described Karl as a leader of the Lucerne Street Doggz gang. But the judge credited the juror's testimony that the juror had never shared a household with Karl, that their relationship was on-and-off, and that she had had no contact of any sort with him while he was incarcerated. The judge also credited the juror's testimony that the juror had no bias or opinion or loyalty relating to the Lucerne Street Doggz or any other gang or group. It should be noted that, at the time of empanelment, neither the judge nor the jurors had been informed that the Lucerne Street Doggz had any connection to this case. Although the jurors were asked about their knowledge of a group called M.O.B., the judge credited the juror's testimony that she had never heard of M.O.B., had no information about M.O.B., and had no bias or opinion or loyalty relating to it.

Of critical importance, the judge credited the juror's explanation for why she answered the juror questionnaire as she did. The juror explained that she did not disclose information about Karl both because he was not a member of her household and

because she did not "think he had any relations to this case."[9] It bears noting in this regard that the juror filled out the questionnaire before coming to the court room and before knowing anything about the case, and that this timing supports the judge's finding that the juror's nondisclosure was due to a mistaken idea that she need not disclose information she considered irrelevant. Although the juror subsequently heard a description of the case during empanelment, that description did not mention the Lucerne Street Doggz, any connection between M.O.B. and the Lucerne Street Doggz, or that the case involved gangs. Thus, any connection between Karl's activities and the case at hand would not have been readily apparent, let alone explicit, to the juror. These facts, too, support the judge's credibility determination.

The fact that the juror seems to have used the same erroneous relevancy filter across the board also supports the judge's decision to credit the juror's explanation that relevancy -- and not bias -- was the reason the juror failed to disclose the information about Karl. When it was discovered

---

[9] The questionnaire sought information concerning members of the juror's "family" or "household," without defining either term. Karl had never been a member of the juror's "household." Although Karl and the juror were related by blood, the juror and Karl had never lived together, even as children, and had never been close, leaving it unclear whether they were "family," as that term was intended by the juror questionnaire.

during voir dire that the juror had failed to disclose that she herself had previously been involved in a relatively minor criminal proceeding, she explained, "I didn't think that was that relevant because it was dismissed, so I wasn't thinking that it would affect anything." Moreover, this explanation was accepted as truthful by the judge and defense counsel, all of whom assessed the juror's credibility firsthand and concluded that the fact that she had failed to disclose the information about her own minor criminal history was not a basis to challenge her for cause or peremptorily.

Undoubtedly, the juror should not have filtered her answer on the questionnaire based on her view of whether responsive information was relevant, in contravention of the judge's instruction. But the question here is not whether the juror provided incorrect answers, but whether the judge's finding that the juror did so honestly is clearly erroneous. Given the judge's subsidiary findings, which are well grounded in the evidence she credited from the Fidler hearing, we see no error in the judge's conclusions that the juror answered the questionnaire inaccurately but honestly and that, as a result, the defendants failed to establish that the juror was actually biased.

For three reasons, the dissent would allow a new trial based on the juror's failure to disclose the information

regarding Karl.  First, the dissent asserts that a juror who "knowingly decide[s] not to disclose information called for by [a] juror questionnaire or a voir dire question" cannot, as a matter of law, be found to have been "honest."  Post at  .  To begin with, the determination of whether a juror has been "honest" in answering voir dire questions "is a question of fact [that] rests with the trial judge."  Amirault, 399 Mass. at 626. Here, the record does not support the assertion that the juror "knowingly" or "consciously" made a decision to not disclose information in the sense that the dissent suggests, namely, for the purpose of concealing bias.  Instead, the evidence was that the juror failed to disclose the information because she mistakenly decided it was not relevant.  Clearly, the juror's assessment in this regard was incorrect.  But, for all the reasons we have already set out and therefore do not repeat here, that does not mean that the judge could not credit the juror's explanation.  The juror's credibility was assessed firsthand by the judge twice -- once during voir dire and again during the Fidler hearing -- and the judge accepted the juror's truthfulness both times.  Surely, we are in no position to make a contrary credibility assessment retrospectively.  See Commonwealth v. Day, 387 Mass. 915, 919 (1983) ("it is inappropriate to ask us to reverse a judge's findings involving

credibility, since he saw the witnesses and we did not" [citation omitted]).

Second, the dissent believes that the judge misapplied Amirault by considering the juror's motivation in determining whether the juror was "honest." We do not read Amirault to create a rigid sequence of considerations the judge must use, let alone to confine consideration of the juror's motivation only to deciding whether to grant a for-cause challenge. The dissent's reading appears to be based on the use of the word "first" in the following passage, which the court in Amirault quoted from McDonough, 464 U.S. at 556:

> "[T]o obtain a new trial in such a situation, a party must first demonstrate that a juror failed to answer honestly a material question on voir dire, and then further show that a correct response would have provided a valid basis for a challenge for cause."

Amirault, 399 Mass. at 625. It strains the language to read this passage as creating sequential burdens of proof (i.e., a party must prove one thing before proving the next) rather than additive ones (i.e., a party must prove both). Such a reading also ignores the very next sentence, to which the court in Amirault deliberately added emphasis:

> "The motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial . . . ."

Id., quoting McDonough, supra.  Thus, even were we to accept that McDonough created a two-step sequential test, under Amirault, the question of the juror's motive is the crux of the inquiry.  This makes sense because no assessment of whether an answer is "honest" can be made without looking at motivation.  Otherwise, "honest" becomes a synonym for "accurate," and a new trial would automatically be required in any case where a potential juror fails to disclose responsive information within the juror's possession.

Our reading of Amirault is confirmed by its application of the test it articulated.  First, the court accepted the trial judge's findings that the juror's misstatements were "honest mistakes" and that the juror "did not intend to conceal the information and did not know that defense counsel was misled." Amirault, 399 Mass. at 626.  Based on the trial judge's subsidiary findings regarding the juror's reasons for the inaccurate statements, the Supreme Judicial Court concluded that the juror had answered "honestly" and affirmed the order denying the motion for a new trial.

Third, the dissent argues in favor of changing the law to create a rebuttable presumption of prejudice whenever a juror fails to disclose responsive information during voir dire or on a juror questionnaire.  We offer no opinion on the advisability of changing the law in the manner the dissent advocates.

However, we note that, although in Amirault the court acknowledged that "in certain exceptional circumstances[,] implied bias may be applicable," it rejected the argument that juror bias "should be presumed . . . as a matter of law" whenever there is a nondisclosure.  Amirault, 399 Mass. at 628.

2.  Juror nondisclosure of information bearing on bias; peremptory challenge.  Ortiz alone argues that, even if the juror's failure to answer accurately the juror questionnaire would not have resulted in a viable challenge for cause, it deprived him of his right to intelligently use his peremptory challenges, which is a structural error entitling him to a new trial without a showing of prejudice.  "Although the Sixth Amendment to the United States Constitution and art. 12 of the Declaration of Rights of the Massachusetts Constitution guarantee the right to be tried by an impartial jury, there is no Federal or State constitutional right to exercise peremptory challenges."  Commonwealth v. Mello, 420 Mass. 375, 396 (1995).  Instead, peremptory challenges are creatures of statute.  See Commonwealth v. Berardi, 88 Mass. App. Ct. 466, 472 (2015).

We accept that Ortiz would have exercised a peremptory challenge had the juror accurately disclosed the information about Karl and her relationship to him, and that Ortiz was thus deprived of the intelligent exercise of that right.  But this does not mean that he has shown that he is entitled to a new

trial.  Contrary to Ortiz's claim of structural error, in the absence of actual or implied bias, the deprivation of the nonconstitutional right to peremptory challenges based on juror misconduct is not reversible error without a showing of prejudice.

> "The right to peremptory challenges is simply a means of selecting an impartial jury.  If the remedy of a new trial is not available for violation of the constitutional right to an impartial jury because of juror misconduct unless a court finds that the juror was actually or impliedly prejudiced, it cannot follow that denial of a nonconstitutional right involving jury selection is reversible error without a showing of prejudice."

Amirault, 399 Mass. at 630-631.  Ortiz has not argued, let alone demonstrated, prejudice, and therefore he is not entitled to a new trial based on the infringement of his right to intelligently exercise his peremptory challenges.

3.  Disqualification.  Article 29 of the Massachusetts Declaration of Rights states that judges must be "as free, impartial and independent as the lot of humanity will admit." This means "maintaining not only fairness but also the appearance of fairness in every judicial proceeding" (citation omitted).  Commonwealth v. Morgan RV Resorts, LLC, 84 Mass. App. Ct. 1, 9 (2013).  "[A]ctual impartiality alone is not enough . . . .  In order to preserve and protect the integrity of the judiciary and the judicial process, and the necessary public confidence in both, even the appearance of partiality

must be avoided" (citation omitted).  Commonwealth v. Cousin, 484 Mass. 1042, 1046 (2020).  See S.J.C. Rule 3:09, Canon 2, Rule 2.11 (2016).

A judge must engage in a two-prong analysis to decide whether she should recuse herself.  See Lena v. Commonwealth, 369 Mass. 571, 575 (1976).  The first prong entails a subjective determination that the judge believes she can be impartial in the circumstances.  Cousin, 484 Mass. at 1045.  If the judge answers this prong in the affirmative, "[she] must next attempt an objective appraisal of whether this was a proceeding in which [her] impartiality might reasonably be questioned" (citation omitted).  Id.  At its core, the second prong asks whether an objective observer would "reasonably believe that the judge's impartiality may have been compromised."  Id. at 1045-1046.  To require disqualification, "the bias or prejudice must spring from an extrajudicial source, and not from matters learned from participation in the case."  Fogarty v. Commonwealth, 406 Mass. 103, 111 (1989).  We review a judge's decision not to recuse herself for abuse of discretion.  See Commonwealth v. Eddington, 71 Mass. App. Ct. 138, 143 (2008).

The defendants argue that the judge should have recused herself from ruling on their 2017 renewed Fidler motions and their motions for a new trial.  They contend that an objective observer would reasonably believe that the judge's impartiality

may have been compromised by the fact that she had written a letter of support for the trial prosecutor before he was appointed to the bench and that, after his appointment in 2017, the judge (in her capacity as chief justice of the Superior Court) had had significant professional contact with him.

We see no abuse of discretion in the judge's careful decision to deny the motion for disqualification here. To begin with, as the judge noted, the defendants' Fidler motions and motions for a new trial raised no claim of prosecutorial misconduct. Instead, the focus was entirely on the misconduct of the juror. Second, no claim of prosecutorial misconduct had been suggested -- even by codefendant Goode -- before the motions had been decided. For both of these reasons, the situation here is entirely different from that in Cousin, 484 Mass. at 1045-1046, on which the defendants rely.

Conclusion. We affirm the order denying the defendants' motions for a new trial and the order denying their motion for disqualification.

So ordered.

HENRY, J. (concurring in part and dissenting in part). The juror questionnaire calls for all jurors to answer the following question: "Have you or anyone in your household or family ever had any of the following experiences with the law?" and lists the following: "[b]een arrested"; "[b]een charged with a crime"; "[b]een convicted of a crime"; or "[b]een a witness in a civil/criminal case." This juror (juror) answered the question "no" even though she considered her half-brother, Karl, family and she knew that he was then incarcerated for violent crimes.

The juror made a second decision not to disclose Karl's experience with the law when the judge cautioned all jurors not to decide the relevance of their or their family's experience with the law. Rather than heed the judge's instruction, the juror again intentionally decided to not disclose this information.

The majority concludes that we should confirm the orders denying the defendants' motions for a new trial on the basis that the juror answered the jury questionnaire and voir dire honestly. I cannot agree. The juror consciously withheld information about Karl for which she knew the questionnaire called and then disregarded an instruction of the judge to disclose this same information even if the juror did not think it was relevant.

And while this respected judge thoughtfully analyzed prong two of the applicable test, her conclusion that an "accurate disclosure by the juror would not have given rise to a viable challenge for cause" is clearly erroneous, as explained more fully infra. See Commonwealth v. Amirault, 399 Mass. 617, 626 (1987) ("In the absence of clear abuse of discretion or a showing that the judge's findings were clearly erroneous, the judge's ruling will not be disturbed on appeal"). If that finding is not clearly erroneous, then it is time to adopt a new standard: namely, when a defendant proves by a preponderance of the evidence that a juror intentionally failed to disclose information she knew she had been asked to disclose in voir dire, it should create a presumption that, if unrebutted by the Commonwealth, is sufficient to warrant a new trial. The information that the juror made a deliberate choice not to disclose, regardless of the reason for the nondisclosure, was so close to the subject matter of this trial that the defendants were entitled to a new trial.[1]

Discussion. As the majority correctly explains, to obtain a new trial, a party (1) "must first demonstrate that a juror failed to answer honestly a material question on voir dire," and

---

[1] I dissent only to section one of the majority opinion. I join the majority in sections two and three.

(2) "then further show that a correct response would have provided a valid basis for a challenge for cause." Amirault, 399 Mass. at 625, quoting McDonough Power Equip., Inc. v. Greenwood, 464 U.S. 548, 556 (1984) (McDonough). As to the first prong, "the crucial inquiry is whether the juror's answer was honest; that is, whether the juror was aware that the answer was false" (emphasis added). Amirault, supra at 626. I address each prong in turn and then propose a new rule that better balances the right to an impartial jury with the important need for finality and the practical necessities of judicial management.

1. Whether the juror answered voir dire honestly. The juror checked the "no" box to the question asking if the juror or anyone in her "household or family ever had any of the following experiences with the law?" When the juror checked "no," she knew that Karl, her family member, was incarcerated at the time of this trial, had read in the Boston Herald newspaper about his alleged crimes,[2] and had discussed them with Karl's

---

[2] The newspaper article stated that Karl, then eighteen, was a "leader of the Lucerne Street Doggz" gang, that "more than a dozen members" had been arrested "in a sweep," "with cops linking several shootings to the gang," including one the prior month "that left three teens wounded." The article also stated that Karl was arrested "for a daylight brawl on the steps of the Dorchester District Court" and "has been linked to four recent shootings."

mother and his sister (the juror's half-sister).[3] The juror decided not to disclose information that she knew the questionnaire called for her to disclose.

The juror made a second decision not to disclose Karl's experience with the law. During voir dire, the judge highlighted the importance of the question whether the juror or a household or family member had specified experience with the law. She stated, "This is an area where a lot of people leave something out, perhaps because something happened a very long time ago, or it seems completely irrelevant, or it was dismissed, or it was when you were a juvenile, or for any of a number of reasons people leave something out." She then specifically instructed the jurors that they should not make personal judgments as to relevancy, stating, "It is very important that we have a complete and accurate answer to this question, even if you think it's really irrelevant. Indeed, it may be irrelevant, but we need to know the information so that we can make a judgment about whether it has any relevance."

---

[3] The father of the juror's child also was in a gang affiliated with the victim's gang. He explained in an affidavit that he was in the "group" BMB, that M.O.B. was "the younger generation of BMB," and that these two groups and the Lucerne Street Doggz "are all acquainted with each other and have always been cool with each other." Indeed, "[t]wo [of his] cousins . . . are or at some time were members of the Lucerne Street Doggz." He "was acquainted with" the victim in this case, having met him "in [or] around 2005" and "heard about" the "murder when it happened."

Again, the juror disregarded the judge's detailed and explicit instruction and made a deliberate decision not to disclose her half-brother's experience with the law.[4,5]

---

[4] The juror also learned during voir dire that her relevancy filter was wrong.  She omitted information about her own criminal record, failing to disclose charges for driving without insurance.  This was yet a third time when the juror might have disclosed her half-brother's experience with the law.  Indeed, every time a judge or trial counsel learns that a juror has withheld information they should have disclosed, the better practice would be to ask the juror if there was any other information the juror withheld, such as a family member's arrest, trial, or incarceration.  Here, once the judge and counsel knew the juror had failed to disclose her own criminal history, nobody asked this follow up question.

[5] Even at the evidentiary hearing on the motions for a new trial, the juror continued to evade.  After the juror admitted at the evidentiary hearing that she thought of Karl as a member of her family, that she knew at the time of this trial that he was incarcerated, that she had read the Boston Herald newspaper article, and that she had discussed Karl's situation with his mother and their sister, the juror had the following exchange with the judge:

> The judge:  "At the time of this trial when you came in as a juror, did you have any awareness of Karl being affiliated with any group or any gang or any organization or any other group of people that might be allied in some way?"

> The juror:  "No, not at the time of trial.  No, I did not."

This answer is not true.  The juror had an "awareness" at the time of trial that Karl was a gang leader.  The judge pressed again.

> The judge:  "At any time later on or before, did you have any awareness of that?"

> The juror:  "Later on, like after he got released and stuff, that's what the word on the street was.  But he

The standard set forth in Amirault, 399 Mass. at 626, is clear:  was the juror "aware that the answer was false."  See United States v. Perkins, 748 F.2d 1519, 1531 (11th Cir. 1984) ("the first prong of the McDonough test requires a determination of whether [the juror's] answers were honest, that is, whether he was aware of the fact that his answers were false").  "The determination of this issue is a question of fact and rests with the trial judge."  Amirault, supra.  "In the absence of clear abuse of discretion or a showing that the judge's findings were clearly erroneous, the judge's ruling will not be disturbed on appeal."  Id.  "[A] finding of fact by the trial judge will not be deemed clearly erroneous unless the reviewing court on the entire evidence is left with the firm conviction that a mistake has been committed" (quotation omitted).  Id., quoting Commonwealth v. Tavares, 385 Mass. 140, 156, cert. denied, 457 U.S. 1137 (1982).

This is not a situation where the juror had no memory of an event, see Amirault, 399 Mass. at 622, or where she answered "mistakenly, but honestly," Commonwealth v. Murphy, 86 Mass. App. Ct. 118, 126 (2014).  In fact, the judge correctly

---

didn't tell me personally that's whoever he used to hang out with, no."

Again, the juror denied "awareness" before trial that Karl was part of a gang.

concluded that the juror's answer was "inaccurate," and that the juror "knew it was inaccurate."[6]

The judge's conclusion that the answer was "not dishonest," because "it did not arise from any motive to mislead or conceal, but was based on the juror's independent evaluation of relevance" is an error of law. This conclusion conflated the two-part standard established in McDonough and followed in Amirault, by considering the rationale of the juror for intentionally withholding information during voir dire when applying the first prong of the standard. Instead, the judge must first determine if the juror's answer was honest, that is, if the juror knew their answer was false. Amirault, 399 Mass. at 625. If the judge finds that the juror knew their answer was false, only then should the judge consider the juror's "motives for concealing information," McDonough, 464 U.S. at 556, as the "reason behind the juror's dishonesty is important when considering whether a reasonable judge would strike the juror for cause" (quotation omitted), United States v. French, 977

_____

[6] For an answer during voir dire to be dishonest it must be more than inaccurate -- it must be knowingly inaccurate. That is why I agree with the judge and the majority that the juror's nondisclosure of her half-sister Shantel's experience with the law -- experience the juror did not know at the time of empanelment in this case -- cannot be the basis for a new trial. The juror's disclosure was inaccurate as to her half-sister's experience but it was not dishonest, as the juror was not aware of the inaccuracy during voir dire.

F.3d 114, 126 (1st Cir. 2020), cert. denied, 141 S. Ct. 2601 (2021).[7]  Because the juror knew her answer was inaccurate, she was "aware that the answer was false," Amirault, 399 Mass. at 626, and as a result the judge's determination otherwise was an error of law.[8]

The judge's conclusion that "the juror's judgment of relevance was not, in the circumstances, unreasonable, in light of the limited information she had, both about Karl and about

_____

[7] The majority is correct that Amirault, while quoting McDonough, states that "[t]he motives for concealing information may vary, but only those reasons that affect a juror's impartiality can truly be said to affect the fairness of a trial" (emphasis omitted).  399 Mass. at 625.  However, the first prong of Amirault is whether the voir dire answers are honest.  If the answers are not honest, motive is relevant to the second prong or element of the test.  See French, 977 F.3d at 125 (considering motive for lying under second prong of McDonough); Sampson v. United States, 724 F.3d 150, 167 (2013) (discussing second element of McDonough and "reason behind the juror's dishonesty").

[8] It also is concerning that when the juror was brought in for questioning, the judge assured her that she was "not in any trouble."  In fact, the juror questionnaire states "that a willful misrepresentation or omission of a material fact on this form is a crime" and subjects the violator to a fine.  Compare Massachusetts Court System, Confidential Juror Questionnaire (November 6, 2017), https://www.mass.gov/doc/confidential-juror-questionnaire/download [perma.cc/PRMB-QQQ2], and Commonwealth v. Cousin, 449 Mass. 809, 813 n.9 (2007), cert. denied, 553 U.S. 1007 (2008) (quoting form).  Indeed, in Cousin, the Supreme Judicial Court indicated it may not be practicable to examine a juror on whether their nondisclosure -- in that case misrepresentation of their criminal records -- was intentional or inadvertent, "without risking a violation of their privilege against self-incrimination."  Cousin, 449 Mass. at 822.

any gang activity underlying the incident that was the subject of the case" also is error. The juror's judgment was unreasonable precisely because she had limited information about the facts of this case and she repeatedly ignored the directions on the form, the threat of criminal prosecution, and the judge's additional instruction explaining the obligation to disclose. The juror usurped the role of the judge and counsel, who did have the broader perspective of the case.

Once it is established that a juror has knowingly decided not to disclose information called for by the juror questionnaire or a voir dire question, a defendant has satisfied prong one.[9]

2. <u>Whether defendants could have met their burden by showing a correct response would have provided a valid basis for a challenge for cause</u>. "The second element -- whether a correct response would have given rise to a valid basis for a challenge for cause -- depends on whether 'a reasonable judge, armed with the information that the dishonest juror failed to disclose and the reason behind the juror's dishonesty, would conclude . . . that the juror lacked the capacity and the will to decide the

---

[9] Contrary to the majority's contention, once a defendant has demonstrated that a juror failed to disclose responsive information within the juror's possession, the defendant is not automatically entitled to a new trial. The defendant faces the additional hurdle of prong two: showing that a correct response would have provided a valid basis for a challenge for cause.

case based on the evidence.'"  French, 977 F.3d at 124-125,

quoting Sampson v. United States, 724 F.3d 150, 165-166 (2013).[10]

Judges are afforded significant deference as to their findings

on juror bias.  Commonwealth v. McCowen, 458 Mass. 461, 493-494

(2010) ("Because [t]he determination of a juror's impartiality

is essentially one of credibility, and therefore largely one of

demeanor, we give a trial judge's determination of impartiality

great deference.  We will not disturb a judge's findings that a

juror is unbiased absent a showing that the judge's conclusion

was clearly erroneous" [quotation and citations omitted]).  See

Commonwealth v. Jaime J., 56 Mass. App. Ct. 268, 272 (2002).

The judge found that "accurate disclosure by the juror

would not have given rise to a viable challenge for cause."  She

concluded that "[t]he information the juror would have

disclosed, if she had answered the question accurately, would

have been that [Karl], with whom she had an 'off and on'

relationship, had been charged with and convicted of crimes.

Follow-up questions could have elicited little more, since the

juror knew little more."  The judge's conclusion could only

_____

[10] "This inquiry is both context-specific and fact-specific
and must be based on the 'totality of the circumstances,'
including:  'the juror's interpersonal relationships; the
juror's ability to separate her emotions from her duties; the
similarity between the juror's experiences and important facts
presented at trial; the scope and severity of the juror's
dishonesty; and the juror's motive for lying.'"  French, 977
F.3d at 125, quoting Sampson, 724 F.3d at 165-166.

conceivably be correct if we engage in an inappropriately restrictive reading of McDonough -- that the correct response in and of itself would reveal grounds for challenge for cause.[11]

---

[11] As the Wisconsin Supreme Court noted in State v. Wyss, "[a] narrow reading of the McDonough language ('and then further show that a correct response would have provided a valid basis for a challenge for cause') suggests that the correct response in and of itself must demonstrate the basis for a challenge for cause." State v. Wyss, 124 Wis. 2d 681, 728 (1985), overruled on other grounds by State v. Poellinger, 153 Wis. 2d 493, 505-506 (1990). There, the court discussed how the "harshness of this approach" is easily demonstrated:

> "Take for example a personal injury case where all prospective jurors are asked if they have any children. A juror who has a child fails to respond, but not only does she have a child, but her child had recently been badly injured in an automobile accident. If a litigant sought to have a new trial ordered once having learned of the juror's incorrect answer, that litigant would not prevail if the language of the McDonough opinion was applied narrowly. A correct answer on voir dire would have been that the prospective juror did have a child. However, applying the McDonough language literally, this correct answer would not prove to be sufficient to provide a basis to strike this juror for cause. The correct answer ('yes, I have a child') would not in and of itself provide a basis for a challenge for cause. However, if further inquiry were allowed, it would reveal that not only did she have a child, but that that child had been seriously injured in an automobile accident and, possibly that she harbored antagonistic feelings against drivers of automobiles who caused accidents and insurance companies that contested benefits. A complete inquiry would have revealed that the prospective juror was sufficiently biased to provide a valid basis for a challenge for cause."

Id. at 728-729. As the court in Wyss noted, while a "correct and/or complete answer" may not provide a basis for a for cause challenge itself, it "may well provide the basis for further questions and responses that do uncover bias." Id. at 729.

The parties should be able to ask natural follow-up questions and perform further research on answers a juror gives.

Even assuming the juror was not trying to deceive the judge and even ignoring that the juror demonstrated she would not follow an explicit instruction from the judge, the judge's conclusion is clearly erroneous.  An accurate disclosure should have elicited Karl's name and that he was incarcerated for similar crimes (also being a teen in a gang who committed crimes of violence against other teens in this same community).  A basic Internet search would have revealed the details, as would a check of Karl's record.  See Commonwealth v. Hampton, 457 Mass. 152, 160 (2010) (prosecutor checked background of immediate family member of juror).  Information that the juror who lived "blocks over" from where the crime occurred and was the half-sister of a gang leader of the "most violent gang" in Boston who was incarcerated for similar crimes would have been a basis for a challenge for cause.[12]  Commonwealth v. Prunty, 462

---

[12] Moreover, while it may not have been clear to the judge during voir dire how M.O.B. and Lucerne Street Doggz were related, the Commonwealth, defense counsel, or one of the four defendants could have realized the connection.  In the eighteen months leading up to the time of the murder at issue here, the Lucerne Street Doggz were "the most violent gang in Boston," "was the suspect group in 30 gang-involved shootings" in 2006 (nearly ten percent of all Boston shootings in 2006), was "the victim group in 7 gang-involved shootings in 2006," and "by the end of May 2007, was the suspect group in another 21 gang-involved shootings and the victim group in another 6 gang-involved shootings."  Anthony Braga, Hureau, and Papachristos,

Mass. 295, 305 (2012), quoting Black's Law Dictionary 261 (9th ed. 2009) (challenge for cause is challenge "supported by a specified reason, such as bias or prejudice, that would disqualify that potential juror").  The information the juror chose not to disclose -- regardless of the reason for her nondisclosure -- cast a taint on her ability to be impartial without calling the integrity of the process into question.  Indeed, this whole sordid situation arose because Karl, when subsequently incarcerated with defendant Ortiz, taunted Ortiz with the fact that Karl's sister was on the jury that convicted him.[13]

This conclusion is further bolstered by how the judge handled another juror (juror no. 5) during voir dire who omitted his own criminal experience from the juror questionnaire.  Juror no. 5 knowingly failed to disclose juvenile adjudications, which was discovered when the criminal offender record information (CORI) of each juror was run.  The juror did not disclose his juvenile record because he thought it was sealed.  The judge was sympathetic to the questionnaire putting jurors in a difficult,

_____

Deterring Gang-Involved Gun Violence:  Measuring the Impact of Boston's Operation Ceasefire on Street Gang Behavior, 30 J. Quantitative Criminology 113, 131-132 (March 2014).

[13] The judge found that Karl spoke to Ortiz "in a hostile manner" and "made some reference to his sister having been a juror on Ortiz's trial, and showed a photograph of a woman."

potentially embarrassing position, but concluded that juror

no. 5 "made a conscious decision not to disclose," and she later

concluded, "I think it was a deliberate decision not to

disclose.  So, I am going to excuse him."[14]  The judge reached

this conclusion even though juror no. 5 was relying on being

told that his juvenile record was sealed.  The judge's

interpretation of the nondisclosure was consistent with case

law.  Cousin, 449 Mass. at 822 (once it was verified that juror

did not disclose their criminal history, "judge permissibly

could have drawn the inference that the jurors had concealed

their criminal histories purposefully, and thus could not be

expected to be impartial or to follow the court's

instructions").  Like juror no. 5, the juror central to this

appeal made "a deliberate decision not to disclose."

Because the defendants demonstrated that the juror "failed

to answer honestly a material question on voir dire," and also

---

[14] For juror no. 5, the defendants objected to his excusal, and the Commonwealth argued about juror no. 5 what the defendants now argue about the juror at issue in this case: that juror no. 5 should be excused for cause because he did not answer the written questionnaire properly, he did not disclose the information when the judge asked for it, he made an effort to intentionally mislead, and he did not follow instructions. See Cousin, 449 Mass. at 814 ("The prosecutor also maintained that it was reasonable to assume that falsification of the questionnaire was an indication that the juror could not follow the rule of law in the charge and could not be fair and impartial during deliberations").

"show[ed] that a correct response would have provided a valid basis for a challenge for cause," Amirault, 399 Mass. at 625, quoting McDonough, 464 U.S. at 556, I would allow the defendants' motions for a new trial.

3. Juror dishonesty should create a rebuttable presumption of unfairness. Although I believe that the defendants met the Amirault standard, this case raises the question whether juror dishonesty should create a rebuttable presumption of unfairness in criminal cases. The right to an impartial jury is "the cornerstone of a fair trial; '[t]he failure to grant a defendant a fair hearing before an impartial jury violates even minimal standards of due process.'" Amirault, 399 Mass. at 624, quoting Commonwealth v. Susi, 394 Mass. 784, 786 (1985). Voir dire is intended to protect this "right by exposing possible biases, both known and unknown, on the part of potential jurors. . . . The necessity of truthful answers . . . is obvious." McDonough, 464 U.S. at 554. A juror who subverts the voir dire process by failing to disclose information is a grave threat to heart of our justice system -- the right to an impartial jury.

A rule that better balances the right to an impartial jury with the important need for finality and the practical necessities of judicial management, see McDonough, 464 U.S. at 555-556, is that if a criminal defendant has demonstrated that a deliberating juror knowingly did not disclose information called

for during voir dire, it raises a rebuttable presumption sufficient to warrant a new trial.[15]  Once a defendant makes this showing, they have established an affront to the integrity of the process.  At that point, the misbehaving juror is the party in control of the information, not the defendants, and it simply is not fair to put the burden of proof on them.  Demonstrating a valid basis for a challenge for cause can be difficult.  A juror may face criminal penalties if they (or their family) admit their deception and otherwise have their own motives to conceal that they have withheld information to be seated in the jury box.  See Smith v. Phillips, 455 U.S. 209, 221-222 (1982) (O'Connor, J., concurring) ("Determining whether a juror is biased or has prejudged a case is difficult, partly because the juror may have an interest in concealing his own bias and partly because the juror may be unaware of it").

---

[15] The majority "note[s] that, although in Amirault the court acknowledged that 'in certain exceptional circumstances[,] implied bias may be applicable,' it rejected the argument that juror bias 'should be presumed as . . . a matter of law' whenever there is a nondisclosure." Ante at   .  The Supreme Judicial Court rejected the argument "in the circumstances" presented in Amirault, where the juror voir dire answer was honest (because she genuinely did not remember the information she should have disclosed).  That is not this case.  This juror made a deliberate choice to withhold information she was asked to disclose.  Further, in Amirault the court was discussing implied bias, which bypasses the two-part test in Amirault, and is not at issue here.  See Amirault, 399 Mass. at 628 & n.5.

Placing the burden of proof on the Commonwealth also is consistent with how we handle exposure of the jury to racial prejudice. In that situation, the defendant "bears the initial burden of proving, by a preponderance of the evidence, that the jury were exposed to statements that infected the deliberative process with racially or ethnically charged language or stereotypes." McCowen, 458 Mass. at 497. "If the defendant meets this burden, the burden then shifts to the Commonwealth to show beyond a reasonable doubt that the defendant was not prejudiced by the jury's exposure to these statements." Id.

As unpalatable as it is to re-do a murder trial, there comes a point where we cannot deny a new trial without damaging the integrity of the system. The juror lived within "blocks" of this violent murder. She had a family member convicted of similar crimes in the same neighborhood who was incarcerated at the time of voir dire in this case. Her family member was reported to be the leader of a gang that was "cool with" M.O.B. (the gang in which the victim was a member). The theory of the Commonwealth's case was gang retaliation against a member of M.O.B.[16] In the light most favorable to the Commonwealth, the

---

[16] At the start of voir dire, the Commonwealth explained to the judge and defense counsel that the victim was affiliated with a gang known as M.O.B. and "some of the defendants were affiliated with" a gang known as Wilcock Street or Ten Block gang.

jury verdicts were based on the theory that the victim came or was lured to Wilcock Street and the defendants and others at Wilcock Street killed the victim, who was a member of M.O.B., in retaliation for him having severely sliced the face of a fourteen year old relative of one of the defendants.[17]  The juror knew Karl's experience with the law and yet she made a deliberate decision not to disclose this on the jury questionnaire.  She then "violated" an express instruction from the judge "to disclose all responsive information regardless of the juror's view of relevance."  The juror got caught applying her own erroneous relevancy filter to her own criminal record.  Still, she did not share the criminal history known to her, persistently refusing to disclose the information requested.  At some point, for the integrity of the system, we reach a bridge too far.  This is a bridge too far for me.

Accordingly, to this extent, I dissent.

---

[17] The judge found that "the evidence presented to the jury did not make reference to any gang affiliation of anyone."  This finding was clearly erroneous.  At trial, there was evidence that someone from M.O.B. cut the face of the cousin of defendant Ortiz and that that person was the victim, and there were numerous references to the "MOB" "group," "member[s]," "crowd," "associates," and even once "the MOB gang or group" and an explanation that M.O.B. stood for "Money Over Bitches," which could hardly be mistaken for a fraternal organization.  Our earlier decision in these matters referred to testimony about the M.O.B. gang.  See Commonwealth v. Mitchell, 89 Mass. App. Ct. 13, 15-16, cert. denied, 580 U.S. 899 (2016).